FILED

2015 Apr-27  AM 09:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

Page 1

EXAMINATION UNDER OATH OF:
MICHAEL BARAKAT


November 13, 2014
9:37 a.m.
505 20th Street North, Suite 1700
Birmingham, Alabama


REPORTED BY:  FRANCEE LOYD

Page 2

APPEARANCES


Ms. Sue Elizabeth Williamson
Attorney at Law
Klasing & Williamson
1601 Providence Park
Birmingham, Alabama 35242

Mr. J.D. Lawrence
Attorney at Law
Farris, Riley & Pitt
505 20th Street North, Suite 1700
Birmingham, Alabama  35203

Ms. Jewel Stubbs, EMC

Page 3

INDEX
PAGE:

EXAMINATION BY MS. WILLIAMSON:          5

EXHIBITS

Exhibit 1 (Sworn Statement in POL)       49
Exhibit 2 (inventory of items)         50
Exhibit 3 (drawing)            58
Exhibit 4 (incident report)         104
Exhibit 5 (T-Mobile records)         107
Exhibit 6 (MJC letter)         110
Exhibit 7 (Alabama Sales Return doc)     123
Exhibit 8 (color photo)         129
Exhibit 9 (color photo)         135
Exhibit 10 (news article)         138
Exhibit 11 (color photo)         138
Exhibit 12 (tax assessment document)     143
Exhibit 13 (EMC letter)         149
Exhibit 14 (reservation of right)       150
Exhibit 15 (authorization)         204
Exhibit 16 (req for copy of tax return)  204
Exhibit 17 (items to produce)         213

Page 4

Page 5

1        MICHAEL BARAKAT,
2 being first duly sworn, was examined and testified
3 as follows:
4
5 EXAMINATION BY MS. WILLIAMSON:
6        Q.    Tell me your full name, please, sir.
7        A.    Michael Ahab Barakat.
8        Q.    A-H-A-B?
9        A.    Correct.
10        Q.    Okay.  Now, the name I-H-A-B, is that
11 you?
12        A.    That's correct.  That's my birth name.
13        Q.    Okay.  So have you changed your name
14 officially to Michael?
15        A.    Not officially.
16        Q.    Okay.  So what is your birth name?
17        A.    Ihab.
18        Q.    Spelled with an I?
19        A.    I.
20        Q.    Okay.
21        A.    Pronounced with an A.
22        Q.    Okay.  So any documents that I see Ihab
23 Barakat, that's you?

Page 6

1        A.    That's me.
2        Q.    Okay.  Now, who is Blake Barakat?
3        A.    My wife.
4        Q.    I had about figured that out, I
5 thought, but I wasn't sure.
6        A.    It's a male's name.
7        Q.    Well, not necessarily.
8        A.    Unisex.
9        Q.    So many people now are naming their
10 children what sounds like someone else's last name.
11 I've got a grandson named Jackson which usually you
12 think of as a last name.  Okay.  Tell me your date
13 of birth, please, sir.
14        A.    November 15th, ███.
15        Q.    Almost got a birthday coming up.
16        A.    Day after tomorrow.
17        Q.    Happy birthday in advance.
18        A.    Thank you.
19        Q.    What's your Social?
20        A.    417-31-███.
21        Q.    All right.  Now, we're here to talk
22 about the fire at the business known as 205
23 Customs.  Is there anyone who has an interest in

Page 7

1 that business other than yourself?
2        A.    As of now, no.
3        Q.    Okay.  What about as of the time of the
4 fire?
5        A.    The lienholder.
6        Q.    Okay.  Now, who is that?
7        A.    Mekdad Investments.
8        Q.    All right.  And you said not as of now.
9 Has the mortgage loan been paid off?
10        A.    I wrote a check on it last month.
11        Q.    Okay.  And how much did you pay to
12 satisfy the mortgage?
13        A.    The complete asking price.  I have
14 paperwork from the lawyer I haven't even read that
15 says that it's been released out of lien.
16        Q.    Okay.  Do you remember how much you
17 just paid?  It doesn't have to be to the penny.
18 Just tell me generally how much you paid.
19        A.    Thousands.
20        Q.    What?
21        A.    Thousands.
22        Q.    Do you remember how many thousands?
23        A.    No, I don't.

Page 8

1        Q.    All right.  You said you wrote a check,
2 right?  Would it have been $32,314.20 on
3 August 26th?
4        A.    Oh, no, no, no, no.  That was a -- a
5 closing on a foreclosure that I bought.
6        Q.    Okay.  So you bought a house at
7 foreclosure that day?
8        A.    I do real estate and that was the
9 closing date, if it's in August.
10        Q.    August 26th, like three days after the
11 fire.
12        A.    Yeah.
13        Q.    Okay.  And what house did you buy that
14 day?
15        A.    It's a six-acre property in Pleasant
16 Grove with a house, a barn and a separate car
17 garage -- detached car garage.
18        Q.    Now, I noticed at some -- I have a
19 tendency to skip around.  I apologize about that.
20 But I noticed in something I read that you said
21 that you had rental properties?
22        A.    I do.
23        Q.    So is that the purpose of this

Page 9

1  foreclosure you just purchased?
2      A.   Some I sell and finance and some I
3  would rent.
4      Q.   All right.  I noticed on your 2013
5  taxes, though, you only have one house that's
6  listed as a rental.  Did you have more than one in
7  2013?
8      A.   I don't know.  If there's one on there,
9  then it's one on there.
10     Q.   Then that's all you had?
11     A.   Uh-huh.
12     Q.   Is that a yes?
13     A.   Yes.
14     Q.   Okay.  How many do you own right now?
15     A.   Including out of state?
16     Q.   Yes.
17     A.   Including the ones that I'm financing
18  but they've been sold to other people?  Like
19  somebody approach me and say I want to buy this
20  house, but I don't have good credit, so I act like
21  the bank and I hold the mortgage.
22     Q.   So you're rent-to-own?
23     A.   Similar to that.

Page 10

1      Q.   Okay.  Yes.
2      A.   But not exactly similar to it.  I hold
3  -- I sold it, you know -- I sold the property, but
4  I hold the mortgage.
5      Q.   Okay.  So --
6      A.   And they have a down payment.  We go to
7  closing and they pay me for so many years until the
8  balance is satisfied.
9      Q.   Okay.  Let's do it in two parts then.
10  Tell me how many of those kind of houses you have
11  where you're holding the mortgage.
12     A.   One.
13     Q.   Okay.  And where is it located?
14     A.   In Tarrant.
15     Q.   Tarrant?
16     A.   Yes.
17     Q.   All right.  And how many where you're
18  holding them as rental property?
19     A.   Three.
20     Q.   All right.  And where are those
21  located?
22     A.   Center Point, Pleasant Grove, Tarrant,
23  also closing on three more in downtown.

Page 11

1      Q.   When is the closing on those?
2      A.   Within a week to ten days.
3      Q.   Are those commercial properties?
4      A.   They have tenants in them, but, you
5  know, the bank is foreclosing.
6      Q.   But is it commercial property or
7  residential?
8      A.   Residential.
9      Q.   Okay.  And these are all foreclosures,
10  the three that you're about to --
11     A.   Yes.
12     Q.   Okay.  Now, this 205 Customs at the
13  present location, is it 4300 First Avenue North?
14     A.   Yes.
15     Q.   How long have you been at that
16  location?
17     A.   Since 2012.
18     Q.   Okay.  And prior to that, where did you
19  operate 205?
20     A.   On Ninth Street, 212 Ninth Street
21  North.
22     Q.   Okay.  And what part of town is that
23  in?

Page 12

1      A.   Right across downtown by 65.
2      Q.   How long did you operate the business
3  at that location?
4      A.   Since 2004.
5      Q.   Was that your first location?
6      A.   Second location.
7      Q.   All right.  Where was the first one?
8      A.   Sixth Avenue South.
9      Q.   Do you remember the number?
10     A.   It's in Titusville.  141 Sixth Avenue
11  South.
12     Q.   And when did you start operating there?
13     A.   In 2001.
14     Q.   Okay.  And was that your first
15  location --
16     A.   Correct.
17     Q.   -- operating as 205 Customs?
18     A.   No.  It was called The Hookup Shop and
19  I had a partner when I took -- when I moved from
20  Sixth Avenue, I opened 205 Customs as an LLC, sole
21  proprietor corporation.
22     Q.   Okay.  Who was your partner at The
23  Hookup Shop?

**Michael Barakat**                                                                     **4**

Page 13

1    A.   Sam, last name is Naser, N-A-S-E-R.
2    Q.   All right.  When you started 205
3  Customs in 2004, did he have any interest in that?
4    A.   At all, no.
5    Q.   Okay.  Was it anybody other than
6  yourself?
7    A.   It was my brother, Sam.
8    Q.   Brother Sam.  And what's Sam's last
9  name?
10    A.   Barakat.
11    Q.   Okay.  And what is his birth name?
12    A.   Sam.
13    Q.   Sam?  Okay.  Any other name?
14    A.   No.
15    Q.   Just Sam Barakat?
16    A.   Uh-huh.
17    Q.   Well, how did that happen?
18    A.   We have seven brothers and one sister.
19    Q.   So your mom ran out of names?
20    A.   No.  My dad is a bilingual, you know --
21  he's a linguistics professor in University of New
22  York, so everybody got a name, whether it was
23  French, German, you know.

Page 14

1    Q.   So seven brothers, eight counting you?
2    A.   Yes, seven brothers, one sister.
3    Q.   So are any of your brothers Birmingham
4  residents?
5    A.   No.
6    Q.   Okay.  And where does your dad live?
7  In New York?
8    A.   He lives in Grand Rapids, Michigan.
9    Q.   Okay.  Let me get a little bit of
10  background here.  You said your wife's name is
11  Blake.  Do you have children?
12    A.   Six.
13    Q.   Six children, okay.  Tell me their
14  names and ages.
15    A.   Ali, A-L-I, 20.  Meme, M-E-M-E, 17.
16  Ahmed, A-H-M-E-D, 16.  Hala, H-A-L-A, 14.  Lulu,
17  L-U-L-U, 10.  Nur, N-U-R, and she is 9.
18    Q.   Okay.  Ahmed is a guy?
19    A.   Yes.
20    Q.   Is he your only son?
21    A.   No, Ali is a son.
22    Q.   Ali is a son?
23    A.   And Ahmed is a son, so two boys and

Page 15

1  four girls.
2    Q.   All right.  Now, how long have you
3  lived in Birmingham?
4    A.   How long have I lived in Birmingham?
5    Q.   When did you move to Birmingham?
6    A.   I lived in Cleveland.  I moved into
7  Birmingham in 1991.
8    Q.   All right.  Cleveland, Ohio?
9    A.   Cleveland, Alabama.
10    Q.   Cleveland, Alabama?
11    A.   I bet you never heard of that one.
12    Q.   Oh, okay.  I've heard of that.
13    A.   Have you?
14    Q.   Yes.
15    A.   I hadn't heard of it until I bought
16  that foreclosure.  I didn't even know it existed.
17    Q.   So where did you come before Cleveland?
18  Where did you live before Cleveland, Alabama?
19    A.   Where did I live before Cleveland,
20  Alabama?  In Gadsden, Alabama.
21    Q.   Gadsden, okay.  And before that?
22    A.   Before that, New York City.
23    Q.   Okay.  And before that?

Page 16

1    A.   Born and raised in Kuwait.
2    Q.   Kuwait.  All right.  And when did you
3  move to New York City?  When did you come to the
4  States?
5    A.   In 1987 after I graduated high school,
6  got acceptance to a college and flew over here, did
7  my ALI and my English test and went straight to
8  college.
9    Q.   And so what did you get your degree in?
10    A.   Did not.
11    Q.   Didn't.  How much did you complete?
12    A.   I kept -- completed two years, but I
13  kept hopping majors and finally I decided I can
14  make a hell of a whole lot more money as a
15  business, as an investor in my own self than
16  anything a degree would bring me.
17    Q.   Okay.  So have you -- what other things
18  have you worked in other than installing electronic
19  stuff in cars?
20    A.   Buying and selling cars, buying and
21  selling real estate, restaurants, opening
22  restaurants.
23    Q.   Since you've operated 205 Customs, have

**Michael Barakat** 5

Page 17

1 you had anyone else who had a financial interest in
2 it, the business itself?
3     A.   No.  There were several 205 Customs
4 impersonators changing -- changing the way that it
5 appears on their sign and those were pretty much
6 moochers that tried to get some of our business
7 because of the reputation.
8         MR. LAWRENCE:  This will go a lot
9 quicker if you just answer the question that's
10 asked.  Okay?
11     A.   Well, no.
12     Q.   Okay.  Thank you.
13         MR. LAWRENCE:  I didn't mean to
14 interrupt.  I just -- just answer her question and
15 just leave it at that.
16     A.   Okay.  Keep it short and sweet.
17         MR. LAWRENCE:  Yeah.
18     Q.   Now, have you ever had a fire before?
19     A.   I have.
20     Q.   Okay.  Tell me about that.  Where was
21 it?
22     A.   Fire was in a rental property in East
23 Lake, 2008, 2007.

Page 18

1     Q.   And who was your insurance company?
2     A.   State Farm.
3     Q.   Do you know what caused that fire?
4     A.   No, I don't.
5     Q.   Did they do an investigation --
6     A.   Yes.
7     Q.   -- like EMC has done on this one?
8     A.   Yes.
9     Q.   Did you -- were you asked to come for
10 an examination under oath?
11     A.   No.
12     Q.   Okay.  Was the claim --
13     A.   They just sent a check.
14     Q.   The claim was paid then, all right.
15 Was there a tenant in the house at the time?
16     A.   Yes, there was.
17     Q.   And do you still own that property?
18     A.   I donated it to Habitat for Humanity.
19     Q.   And what year did you do that?
20     A.   '10, '11.
21     Q.   Were the repairs done?
22     A.   No.  They -- they demolished it.
23     Q.   Okay.  So you were paid for the

Page 19

1 insurance claim and you just left the house as it
2 was and then donated it?
3     A.   Correct.
4     Q.   Okay.  All right.  Any other fires in
5 your lifetime, whether it's a car, a house, a
6 business, anything?
7     A.   Yes, cars.  '06, a Viper SRT
8 convertible, accident on 65, the car catches fire.
9 '07, 2007 Corvette convertible.  2010, it was the
10 new body style Camaro, gets side hit by a deer.
11     Q.   A deer?
12     A.   Yes.
13     Q.   And it caught on fire?
14     A.   Not caught on fire, but these are the
15 accidents.
16     Q.   I didn't ask you about that.  I asked
17 you about fires.
18     A.   Just the Viper.
19     Q.   Okay.  Just the Viper.  Gee, that's too
20 bad.  Those are pretty.
21     A.   Yeah.
22     Q.   What happened that caused the fire?
23     A.   On the Viper?

Page 20

1     Q.   Right.
2     A.   I was in an accident.
3     Q.   But do you know what caused the fire?
4     A.   I could not see.  There was blood all
5 over my face when the ambulance come and got me.
6     Q.   No one told you at any point what
7 caused the fire?
8     A.   No.
9     Q.   All right.  And did you say that
10 happened in 2006?
11     A.   Uh-huh.
12     Q.   All right.  And what year was the
13 Viper?
14     A.   2006.
15     Q.   Okay.  And who was the insurance
16 company?
17     A.   State Farm.
18     Q.   Did they pay the claim?
19     A.   Yes.
20     Q.   Or were you paid by someone else's
21 insurance company?
22     A.   No.  The guy that hit me never stopped.
23 Insurance -- State Farm paid.

**Michael Barakat**                                                          6

Page 21

1    Q.    Okay.  And the other two, the Corvette
2    and the Camaro were accidents?
3    A.    Yeah.
4    Q.    But not fires?
5    A.    No, no, no, no.
6    Q.    Okay.  Any other fires?
7    A.    Not that I know of.
8    Q.    Okay.  What about this 212 Ninth Street
9    North, was there a fire there?
10   A.    212 Ninth Street North, that's the old
11   location.  No, we never did sustain a fire.
12   Q.    Okay.
13   A.    In that business.
14   Q.    And not at 141 Sixth Avenue South?
15   A.    No.
16   Q.    Okay.  Now, other than the 205 Customs
17   and your rental property that you had at the time
18   of the fire, did you have any other source of
19   income?
20   A.    No, that's it.
21   Q.    Does your wife work?
22   A.    No.
23   Q.    Now, there's been a lot of talk about a

Page 22

1    newspaper article that came out where a guy named
2    Omar Mekdad was sitting out in front of the
3    building talking about how he had owned that
4    business for seven years and it could just be
5    destroyed all of a sudden.  Do you know who Omar
6    Mekdad is?
7    A.    This is the lienholder or partner of
8    the company that financed -- sold the property to
9    me.  Several news outlets and TV stations approach
10   me trying to speak to me as I am the owner of 205
11   Customs, but I was in no shape to even see
12   straight, you know, watching my business getting
13   destroyed.
14   Q.    Okay.
15   A.    So he took it upon himself to volunteer
16   information that was 80 percent false.
17   Q.    Okay.  So who else is a part of Mekdad
18   Investments?
19   A.    That, I don't know.  When I bought the
20   property, I went to a law firm in Hoover, McLeod &
21   Associates, and that's where the closing happened,
22   you know, took place.
23   Q.    So these are not people that you knew

Page 23

1    before you bought the business?
2    A.    Yeah, I knew them.
3    Q.    Okay.  So do you know who is the -- who
4    makes up Mekdad Investments?
5    A.    No.  That, I don't know.
6    Q.    Okay.  But you know that Omar is one of
7    the people?
8    A.    Part in it, correct.
9    Q.    Okay.  Do you know any of the others?
10   A.    I know his brother, Moe.  That's the
11   one that collected the checks.
12   Q.    You don't know what his actual name is?
13   A.    He would just go by Moe.
14   Q.    Just Moe, huh?  Okay.  And so what's
15   your agreement as far as the mortgage?  How much
16   were you supposed to pay?
17   A.    $1,000 a month.
18   Q.    Okay.
19   A.    50,000 down and I don't know what the
20   APR rate was.
21   Q.    All right.  And so you have paid that
22   off?
23   A.    Yeah.

Page 24

1    Q.    All right.  And what method did you use
2    to pay it off?  Did you use a check or cash?
3    A.    Check.
4    Q.    Okay.  Well, the checks that were
5    provided to me stopped as of the end of August.
6    Was it after that that you paid it off?
7    A.    Yes.
8    Q.    Okay.
9    A.    October.
10   Q.    Okay.  Would you possibly give me the
11   next two bank statements that would reflect that
12   payoff?
13   A.    I could possibly try.  And I also have,
14   like I said, the letter from the lawyer.
15   Q.    Did you use the -- which bank account
16   did you use?
17   A.    PNC.
18   Q.    PNC.  I couldn't remember the initials.
19   A.    What is it, two in town.
20   Q.    There's only two locations?
21   A.    Yeah, that I know of.
22   Q.    All right.  Let's talk about the day of
23   the fire.

Page 25

1    A.  Okay.

2    Q.  Take me through your day.  Tell me when

3  you got to work and what you did.

4    A.  Got to work around -- between 7:00 and

5  8:00, checked my e-mails for new foreclosures,

6  restocked showroom, checked my inventory, make sure

7  we're ready to go.

8    Q.  Okay.  Now, when you say you check your

9  inventory, what are you looking for particularly?

10    A.  I look for showcase items that have

11  been sold and not been replenished, connectors,

12  small items that you must have to install and work

13  in electronics that are not there, write them down,

14  place the order, make sure we're fully prepared for

15  the day.

16    Q.  In that kind of business, is it people

17  who just drive in and want things done or do they

18  make appointments with you to come at a particular

19  time?

20    A.  Both.

21    Q.  So did you have anything scheduled that

22  day?

23    A.  Other than the vehicle that called in

Page 26

1  with the -- the Expedition that said he smelling

2  fire wire or stinky smell in his vehicle,

3  everything was walk-in.

4    Q.  Okay.  Do you remember what jobs you

5  did that day?

6    A.  No.  That, I don't.

7    Q.  Tell me how you keep up with your

8  business records.

9    A.  I have receipt books.  Every job that

10  comes in gets wrote down in detail, parts, labor

11  and the performing install.

12    Q.  I'm sorry?

13    A.  The performing install, the installer

14  that's going to do the job.

15    Q.  Okay.  How many people were working for

16  you at the time this happened?

17    A.  Trey Robinson and BJ.

18    Q.  Okay.  Now, you said BJ.  Who is BJ?

19    A.  Bernard Mauer.

20    Q.  Okay.  Now, do both of them work as

21  installers?

22    A.  Correct.

23    Q.  Okay.  And so are you the only person

Page 27

1  there as far as management or --

2    A.  Yes.

3    Q.  -- taking care of things?

4    A.  Ordering, dealing with public, dealing

5  with employees, with banks, vendors, everything.

6    Q.  Are you there every day?

7    A.  Every day just about.

8    Q.  Okay.  And what are your business

9  hours?

10    A.  9:00 til 7:00 Monday through Friday,

11  10:00 til 5:00 on Saturday, closed Sunday.

12    Q.  All right.  So this particular day the

13  fire happened was a Saturday.  So you got there

14  between 7:00 and 8:00?

15    A.  (Witness nods head.)

16    Q.  Even though you don't open until 10:00?

17    A.  That's correct.

18    Q.  Okay.  All right.  What time did Trey

19  and BJ come in?

20    A.  Around 10:00.  Trey is always late ten,

21  15 minutes.  BJ is on time.

22    Q.  All right.  Tell me what you remember

23  about the morning.  Was there any jobs done, say,

Page 28

1  from 10:00 to 12:00 that morning?

2    A.  I don't remember.

3    Q.  Okay.  When you fill out your receipt

4  book, you give the person who does -- who is having

5  you do the job a copy of that receipt?

6    A.  Correct.

7    Q.  And what do you do with the receipts

8  that you keep?

9    A.  It stays in the book.

10    Q.  Okay.  And where is the book kept?

11    A.  The book is kept -- they go all in the

12  box and the box is shifted at the end of the month

13  for me to keep up with sales going up or down,

14  profits and losses.

15    Q.  Okay.  Now, what box is the receipt

16  book kept in?

17    A.  What do you mean?

18    Q.  You said that the receipt book is kept

19  in the box.

20    A.  Yeah, cardboard box.

21    Q.  Okay.  And do you still have the

22  receipt book from the month of August?

23    A.  It was on the counter.

Page 29

1    Q.   In the store?
2    A.   Yes.
3    Q.   Okay.  Were you able to recover it?
4    A.   I haven't looked for it.
5    Q.   Okay.  What did you take out of the
6    business?
7    A.   What did I take out of the business?
8    Q.   Right.  As far as any kind of business
9    records, what did you remove from the business
10   after the fire?
11   A.   I have taken a folder that has all the
12   expenses from the minute I walked in the store as a
13   purchaser til it got opened, contractors, painters,
14   showcases, you know, improvements that I had done
15   on the store.
16   Q.   Okay.  You took that out after the
17   fire?
18   A.   After the fire.  There was a police
19   officer there that called and advised that the
20   store has been broken into.
21   Q.   Okay.  You're talking about when those
22   people went in and got the rims?
23   A.   No.  The ones that got the rims were

Page 30

1    three females or four females from my
2    understanding.  This was before that.
3    Q.   Okay.
4    A.   The store got broke into three times
5    after the accident.
6    Q.   Three times after the fire?
7    A.   Correct.  And each time I had a police
8    officer -- Birmingham PD called me.
9    Q.   Okay.  Well, I was only aware of one
10   time.  When was the first time it was broken into?
11   A.   I think a day right after the loss.  I
12   get a police officer calling me at 6:00 o'clock in
13   the morning that the front door has been sheared,
14   cut open, that I needed to be there so that they
15   could go in there and see if there's anything
16   missing.
17   Q.   Was anything missing?
18   A.   I couldn't tell.  The place was burnt.
19   I seen a bunch of stuff -- items being drug from
20   the inside storage over to where the door was cut.
21   Q.   All right.  When was the second
22   break-in?
23   A.   Second break-in was probably three,

Page 31

1    four days ago -- I mean, three, four days past that
2    one.
3    Q.   All right.  Tell me about that one.
4    A.   Police officer called, said they
5    apprehended four, maybe three females taking out
6    copper, rims, parts from the shop and loaded them
7    up onto a van.
8    Q.   Okay.  And all those things were
9    returned, right?
10   A.   No.
11   Q.   Okay.  What happened to the things they
12   loaded on the van?
13   A.   I called the -- he was trying to advise
14   me that it's not worth pressing charges, that these
15   items are worthless now because of the fire, that I
16   could get them back.  But I said I paid full price
17   for these items, I want to prosecute to the fullest
18   extent of the law.  And I saved his message on my
19   phone to know the name of the officer or detective
20   that called.
21   Q.   Do you remember the name?
22   A.   No, but I did call the DA, Ms. Black at
23   the DA's office, and tried to follow up on what's

Page 32

1    going on with the case.
2    Q.   Okay.  So where is the merchandise now?
3    A.   Police department.
4    Q.   Okay.  So they --
5    A.   Evidence room.
6    Q.   They took it?
7    A.   Yeah.
8    Q.   Okay.  All right.  Was there a third
9    break-in?
10   A.   The third break-in -- I drove by the
11   shop and the guy that boarded up the front of the
12   building was standing there with his truck.  And I
13   stopped and I say what are you doing out here.  He
14   said that somebody had knocked the wood behind the
15   -- behind the metal door in the front and he don't
16   know what they got in, what they had got out, but
17   he was trying to put it back up.  And he didn't
18   charge me anything for it.
19   Q.   Okay.  Did you go in and see if
20   anything was missing?
21   A.   I went in the first time on the first
22   police report and there was a nail about this big
23   (indicating) that penetrated the bottom of my shoe

Page 33

1 and into my foot. And that was the last time I
2 went into that place.
3    Q.   Okay. Did you make a police report the
4 third time?
5    A.   Yes, police report -- no, police report
6 on the first two times, not the third time.
7    Q.   The receipt book you were talking
8 about, do you keep the same receipt book for
9 whether the purchase is paid for by cash or credit
10 card or check?
11   A.   Everything is noted.
12   Q.   Everything?
13   A.   On it.
14   Q.   In that receipt book?
15   A.   (Witness nods head.)
16   Q.   And is that receipt book what you used
17 that you give to Ms. Harbison to figure your taxes
18 and your profit and loss statements?
19   A.   No.
20   Q.   Okay. How do you do that?
21   A.   I give her numbers.
22   Q.   Okay. So you calculate those things
23 yourself and give them to her?

Page 34

1    A.   Correct.
2    Q.   Now, for example, when you give her the
3 information to do your sales tax returns, do you
4 report all of your sales?
5    A.   No.
6    Q.   Okay. What sales do you report?
7    A.   I report sales that don't have any
8 labor involved in them, like somebody would come
9 and buy a head unit or a set of rims, take them
10 somewhere else to get them put on.
11   Q.   So if somebody comes in and gets you to
12 do a job and they buy the parts from you and your
13 people install it, you only report the sale of the
14 product or do you just not report --
15   A.   Sometimes sale of product and
16 installation. Sometimes just sale of product and
17 round it up to a whole figure.
18   Q.   Okay. So there's no definitive way
19 that you do it each time?
20   A.   No.
21   Q.   When is the last time that you did a
22 physical inventory?
23   A.   Physical inventory would be last

Page 35

1 November.
2    Q.   So November, 2013?
3    A.   Correct.
4    Q.   So how did you do that?
5    A.   I count everything in the shop.
6    Q.   Okay. And do you enter that into your
7 computer?
8    A.   No.
9    Q.   You just had -- wrote it down on a
10 sheet of paper?
11   A.   On a paper.
12   Q.   Okay. And what did you do with that?
13   A.   In a desk.
14   Q.   And did you use those figures on that
15 to report to Ms. Harbison how much your inventory
16 was for the year ending?
17   A.   Not all of it.
18   Q.   Okay. So how did you figure out what
19 to report and what not to report?
20   A.   I make suggestions.
21   Q.   Okay. What do you mean?
22   A.   I mean if the inventory is 90,000 or
23 100,000 or 120,000, I give her the numbers and I

Page 36

1 say which would be safest to go with to avoid the
2 taxation.
3    Q.   Okay. So you don't report your
4 actual --
5    A.   No.
6    Q.   -- inventory? Were there any records
7 anywhere that would reflect your actual business
8 income and your expenses other than in the store?
9    A.   There's a box of receipts that spans
10 six to eight months I handed to the adjustor as
11 well as purchases from suppliers. That would
12 reflect what was going on in the store as far as
13 product and the receipts would reflect what's
14 coming out as sales.
15   Q.   And that six or eight months would have
16 been in 2014?
17   A.   I don't know what was in that box. It
18 was something I saved out, you know. I said
19 Morgan, here's real time receipts, daily basis,
20 what comes in, what goes out.
21   Q.   Daily receipts?
22   A.   Daily receipts, daily receipt books.
23   Q.   You gave him some daily receipt books?

Page 37

1    A.   A whole box this big (indicating).
2    Q.   All right.  Now, what do those daily
3  receipt books look like?
4    A.   Standard sales receipts, head letter
5  205 Customs, phone number, vehicle, description of
6  item or repair, price, labor, parts, total.
7    Q.   Is the receipt book about the size of
8  half of an eight and a half by eleven sheet of
9  paper?
10   A.   Exactly.
11   Q.   Okay.  Now, previously on several
12  occasions we had asked that a Sworn Statement in
13  Proof of Loss form be submitted so EMC would know
14  what kind of claim you were making.  So can you
15  tell me today what dollar figure you're making for
16  the building itself?
17   A.   The lowest estimate on the building was
18  600,000.
19   Q.   Okay.  And whose estimate was 600,000?
20   A.   Jones Construction out of Arab, if I'm
21  not mistaken, Arab, Alabama.
22   Q.   Okay.  And how did you make contact
23  with Jones Construction?

Page 38

1    A.   Yellow pages.
2    Q.   That's not someone that you know?
3    A.   No.
4    Q.   I think I looked at that estimate and
5  it was like I can't really give you a number
6  because the plans have to be approved by the City
7  or something like that.
8    A.   Those are the plans, which is -- he
9  said that it's going to be an extra 30 to 34,000.
10  That's just the plans to go to the City.  But the
11  structure to be replaced the same way this one was,
12  he did estimate 600,000.  I also estimated with a
13  metal building.  Came up higher than 600,000.  I
14  said how could metal be more expensive than block
15  and brick and concrete.
16   Q.   So is that to replace it with the same
17  configuration it had --
18   A.   The same building.
19   Q.   Same building?
20   A.   Just open the business back up and do
21  the same thing we were doing.
22   Q.   Okay.  Well, have you decided what
23  you're going to do?

Page 39

1    A.   Open my business back up.
2    Q.   But I'm asking:  Are you going to make
3  a brick and mortar building or metal?  What have
4  you decided?
5    A.   Depending on what EMC decides to do.  I
6  mean, regardless, I'm at a loss.  I'm imagining if
7  they pay the full replacement cost, I'm still $160
8  in the hole that I have to pay, 160,000 to complete
9  the building and then come out inventory and
10  showcases, decorations, you know.  This is the
11  fifth or sixth store that I put together, so I know
12  that I'm losing money on both ends.
13   Q.   You told me earlier that you had -- you
14  had the information about how much it had cost you
15  to redo that building after you bought the
16  property.  Tell me what you did to it.
17   A.   I knocked two walls -- inside when you
18  walk in the building, there was a cubicle office on
19  the left, one on the right and a small one in the
20  front.  I had a contractor come in, brace the wall,
21  the ceiling, knock those two walls -- block walls
22  down and build a brace to hold them up.  Everything
23  was painted.  All the lights were changed, you

Page 40

1  know, to match the era that we were in.  The back
2  was cleaned up, cleared out and, you know, I moved
3  my equipment from tire machines, balance machines,
4  compressors to get it ready to do business the way
5  we do it.
6    Q.   Okay.  But as far as renovations to the
7  building, the only thing you did was remove a
8  couple of walls and reinforce the --
9    A.   Complete paint, complete plumbing.
10   Q.   Okay.  All right.  Now, when you say
11  complete plumbing, what does that mean?
12   A.   Stripped the -- both bathrooms on the
13  left and the right for the appliances or fixtures
14  and installed brand new fixtures and brand new
15  floors.
16   Q.   Okay.
17   A.   Linoleum floors.
18   Q.   And how much would you say that it cost
19  for you to do the things that you did?
20   A.   Between the plumbing -- the plumbing
21  was about 8,000.
22   Q.   Okay.
23   A.   The flooring, he charged me 1,500 for

**Michael Barakat**                                                        **11**

Page 41

1   both bathrooms and then he charged 2,000 to tile
2   the showroom and put a tile entry foyer at the
3   front door.
4        Q.    Did the 8,000 include taking down those
5   walls and reinforcing the beams?
6        A.    No.  That's just the plumbing.
7        Q.    Okay.  How much to take down the walls
8   and reinforce the beams?
9        A.    To take down the walls was about
10  15,000.
11       Q.    Okay.  Is that it?  So roughly 26,5?
12       A.    Brand new central heat and air unit.
13       Q.    All right.  How much was that?
14       A.    2,800.  It's coming back to me.
15  There's a bunch of stuff I didn't put in the loss
16  report.
17       Q.    Okay.  Anything else?
18       A.    There was sound beaters, sound
19  equipment that I didn't put on there.
20       Q.    That's not a part of the building,
21  though, is it?
22       A.    We're talking about the building.
23       Q.    Right.

Page 42

1        A.    I spent 2,800 in burglar bars.  I spent
2   about $1,000 for a complete alarm system.
3        Q.    How much?
4        A.    I would say $1,700 to wire the whole
5   store with alarm systems.
6        Q.    Okay.
7        A.    About 5,000 for camera surveillance
8   with Internet-dedicated ISP -- I mean dedicated
9   number, whatever they call it, to where --
10       Q.    But you didn't have any fire alarm with
11  that, did you?
12       A.    I had fire alarm.  I had fire alarm and
13  regular alarm.
14       Q.    Okay.  Well, the alarm company said you
15  did not have fire alarm.
16       A.    They told me they making me pay for
17  fire alarm.
18       Q.    Really?
19       A.    Yeah.
20       Q.    Because they didn't get an alert.  At
21  least that was what we found out.  But it was your
22  understanding you had fire alarm?
23       A.    Yes.

Page 43

1        Q.    Okay.  Can you think of anything else?
2        A.    Camera surveillance.
3        Q.    Okay.  That's the 5,000 you just told
4   me about?
5        A.    5,000 with static IP to where I can
6   watch it anywhere in the world.
7        Q.    Okay.
8        A.    Paint inside the building.
9        Q.    How much was that?  Didn't we talk
10  about that already?
11       A.    The paint -- outside I hired a company
12  to.  To paint inside, me and Blake did it.
13       Q.    Okay.
14       A.    Which was about $2,000.  The one
15  outside was about 3,500.  We did about $800 worth
16  of repairs to the roof where it was leaking.
17       Q.    So it looks like about $40,000 worth of
18  upgrades in addition to the $80,000 purchase price?
19       A.    I estimated 35 to 50.
20       Q.    And the purchase price for the building
21  and the land was 80, right?
22       A.    80, correct.
23       Q.    Okay.  All right.  Now, prior to this

Page 44

1   fire, had you ever had any other like break-ins or
2   anything else there at the business?
3        A.    Absolutely.
4        Q.    So before the fire, you had had a
5   break-in?
6        A.    Yes.
7        Q.    Okay.  When --
8        A.    That location?
9        Q.    That location.
10       A.    No.
11       Q.    Okay.  But at the previous location on
12  Sixth --
13       A.    Yes.
14       Q.    -- you had break-ins?
15       A.    Yes.
16       Q.    How many?
17       A.    The first one, they stole somebody's
18  Chevy truck and went to the side of the building
19  and backed it up, rammed it in our building, tore
20  down a section of 14 by 12 brick block wall inside
21  the building.  The alarm went off.  The power went
22  off.  They stumbled in, one of them got caught --
23  got caught on the rebar by his leg until the

**Michael Barakat**                                                                 **12**

Page 45

1  detective showed up.  It was three black kids.  And
2  the second time --
3      Q.  When was that one?
4      A.  I try to get the police reports, but
5  they would not cooperate with me.  This was in
6  2007, 2008.
7      Q.  Okay.
8      A.  No claim was filed.  I paid $18,000 to
9  replace the roof, the wall, because we were leasing
10  the building, and replace all the items that were
11  stolen.
12      Q.  Okay.  Why did you not make an
13  insurance claim?  Were you renting the property?
14      A.  I was renting the property.
15      Q.  Okay.  And did the owner not have any
16  insurance on it?
17      A.  There was too much drama going on
18  around the building.  The people we were paying
19  rent to, Leitman, Perlman & Rich out of Lakeshore,
20  did not actually have possession legally of the
21  building.  The State of Alabama bought it from the
22  County in 1997 after three years of no taxes being
23  paid on it.  The owner of the whole block sold

Page 46

1  several parcels.  They called Metro Detail -- Auto
2  Detail, three store fronts on Ninth Street and then
3  us, 205 Customs.  He let Leitman, Perlman manage
4  it.  However, he never split parcel ID, so it was
5  all under one parcel ID and the State of Alabama
6  owned it.  I hired Jeff Palmer to do a title search
7  to try to purchase it and he said you need to stay
8  away as far as you can from that building because
9  it's nothing but headache.
10      Q.  Sounds like it.
11      A.  Too many people has got their hand in
12  the cookie jar.
13      Q.  Okay.  So did you have any insurance on
14  your business when you were on Sixth Avenue?
15      A.  Yes, same people.
16      Q.  What same people?
17      A.  EMC -- no, no.  EMC, I got turned on by
18  a supplier, a wholesaler in Jefferson County.
19          MR. LAWRENCE:  Who has your insurance
20  on the building?
21      Q.  Back in --
22      A.  I don't know.
23      Q.  Okay.

Page 47

1      A.  I don't even know who EMC was until
2  this incident happened.  I was approached by a lady
3  named Michael and --
4          MR. LAWRENCE:  All right.  Just answer
5  her questions.  Okay?
6      A.  Okay.
7      Q.  Yeah, you -- I think you were insured
8  with EMC first in 2010.  So where would you have
9  been in 2010?
10      A.  I don't know.
11      Q.  Would you still have been at the Sixth
12  Avenue address?
13      A.  No.  2010, we were on Ninth Street.
14      Q.  Okay.  So you were in that building
15  before you bought it in 2012?
16      A.  No.  You got three addresses.
17      Q.  Okay.  I skipped one address.  Okay.
18  Where was the other one?  Let's see.  Ninth Street?
19      A.  Yes.
20      Q.  Okay.  So were you at Ninth Street when
21  you were first insured by EMC in 2010?
22      A.  Yes.
23      Q.  Okay.  Prior to EMC, who were you

Page 48

1  insured with?
2      A.  I don't remember their name.
3      Q.  Were you ever cancelled or non-renewed
4  by any company?
5      A.  No.
6      Q.  Did they ever tell you they would not
7  insure you anymore?
8      A.  (Witness shakes head.)
9      Q.  Okay.  So I think I asked you a few
10  minutes ago what claim you were making for the
11  building itself.  So you told me that the lowest
12  estimate you had was 600,000.  So am I to interpret
13  that that's the dollar amount you're making claim
14  for?
15      A.  Yes.
16      Q.  Okay.  Now, what about your inventory,
17  your contents?
18      A.  I haven't added up.
19      Q.  All right.
20          MS. WILLIAMSON:  The -- I have 13
21  pages.  Is that what you have, J.D.?
22          MR. LAWRENCE:  Yeah, that's what I
23  have.

Page 49

1      A.    There's a couple of them missing,
2 though.
3          MR. LAWRENCE: Hold on.
4      Q.    A couple of pages are missing?
5      A.    Yes, correct.
6      Q.    Well, where are they?
7      A.    The neighbor, the car lot, claims his
8 four or five cars were scorched by the fire.
9          MR. LAWRENCE: I've got 12.
10     A.    And he gave me a paper. I'm not sure
11 if I turned it in or put it in one of the vehicles.
12 The installers' tool boxes and toys.
13         MS. WILLIAMSON: You may not have that
14 one.
15         MR. LAWRENCE: Is that the last one?
16 Yeah. I have that -- no, I don't have that one.
17         MS. WILLIAMSON: I just happen to have
18 two copies of that one page. I guess that worked
19 out good.
20     Q.    (BY MS. WILLIAMSON:) Okay. Mr.
21 Barakat, let me ask you to take a look at -- I
22 guess I better do some marking here.
23         (Whereupon, Exhibit 1 was marked

Page 50

1          for identification.)
2      Q.    I'll mark the Sworn Statement in Proof
3 of Loss that you gave me this morning that just has
4 the numbers written in that you're going to redo as
5 Exhibit 1.
6          (Whereupon, Exhibit 2 was marked
7          for identification.)
8      Q.    And Exhibit 2 will be this 13-page
9 inventory that I have. Mr. Barakat, would you look
10 that over and let me know if that is the complete
11 list of things you're making a claim for?
12     A.    (Examining document.) Might be missing
13 one or two.
14     Q.    Okay. Well, you understand that if
15 you're going to make a claim for it, you need to
16 find them and send them to me?
17     A.    But they're not mine. They're property
18 of others.
19     Q.    Okay. Well, if you're going to make a
20 claim for it, then they have to be on these forms
21 and submitted to us.
22     A.    They may get them to send me their
23 paperwork. That's all I can do.

Page 51

1      Q.    Well, that goes under their problem,
2 right? So as far as you're concerned, what you're
3 making a claim for, is it described on this
4 13-page --
5      A.    Correct.
6      Q.    -- list that we've marked as Exhibit 2?
7      A.    Correct.
8      Q.    Okay. All right. Let's talk about
9 this 1902 Oldsmobile. Where did you get that?
10     A.    From somebody's barn in Blount County.
11     Q.    Let me back up just a minute.
12 Exhibit 2, the numbers that you put on here, the
13 column says original cost and then replacement
14 cost. So the numbers that you put in this column
15 that says original cost, is that what you paid for
16 the items?
17     A.    Yes.
18     Q.    Okay. And then replacement cost, how
19 did you determine that?
20     A.    You can't buy another one like it.
21     Q.    No, I'm talking about generally. This
22 column that says replacement cost --
23     A.    I mean, I Googled it and seen what was

Page 52

1 the last one sold and what did it bring in.
2      Q.    Okay. You're talking specifically
3 about this car?
4      A.    This particular car.
5      Q.    Okay. I'm talking about just in
6 general. Is that what you did, did you kind of
7 Google the items?
8      A.    Pretty much, and checked with my
9 suppliers, what it cost to replace it.
10     Q.    Okay. All right. So to the best of
11 your knowledge and ability then, the numbers that
12 you have put on here are correct?
13     A.    Yes, ma'am.
14     Q.    All right. And as far as your claim,
15 if I add up these numbers of original cost or
16 replacement cost, would that be the dollar figure
17 you're making a claim for?
18     A.    Yes.
19     Q.    Okay. All right. Now let's go back to
20 the car. You said you got it from somebody's barn
21 in Blount County?
22     A.    Yes.
23     Q.    Tell me how that came about.

Page 53

1    A.   We stopped for directions.  We were
2  coming out trying to get on 65 and we see this
3  garage sale, so we stopped and said how do we get
4  to I-65, me and my wife.  We were in the Corvette.
5  And he say you mean you're not going to try and buy
6  anything.  I said well, I have no interest in
7  child's underwear and toys.  Do you have antiques,
8  do you have machinery?  And he pointed at this 1900
9  hand saw, which I thought the niftiest ever, so I
10  was like how much is that.  He said five bucks.  I
11  said I'll take it.  Now show us how to get to 65.
12  He said but I do have some machinery.  He showed me
13  a boat that was taken apart.  Walked in the barn.
14  I saw a stack of hay and I saw a canopy sticking
15  out of it.  And I said what is that.
16    Q.   Saw a what sticking out?
17    A.   A canopy.
18    Q.   Canopy?
19    A.   A canopy, a horse buggy canopy.  I said
20  what is that.  He said that's a 1902 Oldsmobile
21  R-type.  I said get out.
22    Q.   Did you know what that was?
23    A.   No.  I said does it run.  He said yeah.

Page 54

1  He went and got a key, turned it on, drove it out.
2  It's driven with a yoke.  In my mind, I knew I
3  bought that, now it's just time to haggle and
4  hassle and see what I can get it down to.  He said
5  the restoration hours him and his father and
6  grandfather put in that car were well over
7  30,000 hours.  All wood, wood spokes, yoke
8  steering, oil lamps, just piece of history in
9  America.  I had to have it.
10    Q.   How much did you pay him for it?
11    A.   Five.
12    Q.   Did you pay cash?
13    A.   Cash.
14    Q.   You just happened to have 5,000 cash on
15  you, huh?
16    A.   Uh-huh.
17    Q.   Do you remember the man's name?
18    A.   No.
19    Q.   Where in Blount County?
20    A.   Let me see.  Locust Fork.
21    Q.   So this man told you that this was an
22  actual 1902 car?
23    A.   Yes.

Page 55

1    Q.   Did he mention putting any aftermarket
2  parts on it?
3    A.   No.
4    Q.   Did you do anything to it once you
5  bought it?
6    A.   No.  But I was about to.
7    Q.   Okay.  So you hadn't put any
8  aftermarket parts on it?
9    A.   No.
10    Q.   Okay.  So you don't know how it came up
11  having some aftermarket parts?
12    A.   It does not.
13    Q.   You don't think so?
14    A.   No.
15    Q.   Have you had any training or experience
16  in looking at these kind of cars to make that
17  determination?
18    A.   No.
19    Q.   Okay.  But you know the difference in
20  an actual 1902 and let's say a kit car?
21    A.   No.
22    Q.   Okay.  So when was it that you bought
23  this car?

Page 56

1    A.   '09.
2    Q.   2009?  And where has it been since you
3  purchased it?
4    A.   In my shop.
5    Q.   Did you ever register it anywhere?
6    A.   No.
7    Q.   Get a tag for it?
8    A.   No.  It's got a vintage tag and a tag
9  receipt that has his name on it and a bill of sale
10  and a key.
11    Q.   You said a vintage tag?
12    A.   Uh-huh.
13    Q.   And a bill of sale?
14    A.   And a tag receipt.
15    Q.   Tag receipt in that man's name?
16    A.   Uh-huh.
17    Q.   All right.  And where were those
18  things?  Where was the bill of sale, tag receipt?
19    A.   In my office.
20    Q.   Where in the office?
21    A.   In the desk.
22    Q.   Okay.  Now, this desk that has the tag
23  receipt, same one that has your receipt book?

Page 57

1    A.   My receipt book stays out in the front
2  on the counter.
3    Q.   Okay.  When you come into the building,
4  is there like a built-in desk?  Is that what you're
5  calling the counter?
6    A.   When you walk in the showroom -- this
7  is the front door.  You got showrooms stretching
8  from one end to the other end of the store.  And
9  then behind it is your salesman.  Behind him is a
10  door.  My office is on the left and then behind
11  that there's two wide rooms for storage.
12    Q.   Okay.  And then where do you work on
13  the vehicles?
14    A.   There is a -- okay.  This is the
15  showroom.  There is an L-shaped entryway that goes
16  this way behind the shop and that's where the
17  vehicles go in.
18    Q.   Okay.  None of that really makes a lot
19  of sense to me, so let's go off the record for a
20  minute and can you draw me just the diagram of
21  where the rooms are located?
22    A.   Yeah.
23    MS. WILLIAMSON:  Okay.  Let's go off

Page 58

1  for a second.
2    (Off-the-record discussion.)
3    (Whereupon, Exhibit 3 was marked
4    for identification.)
5    Q.   (BY MS. WILLIAMSON:)  All right.
6  Exhibit 3 is the diagram of 205 Customs.  All
7  right.  Now, your office, when you are not there,
8  do you keep it locked?
9    A.   No.
10    Q.   So anybody could go in there as far as
11  your employees --
12    A.   Right.
13    Q.   -- if they needed anything?  And that's
14  okay with you?
15    A.   That's fine.
16    Q.   Okay.  Were there any cars inside the
17  area where you work on cars that day that the fire
18  happened other than -- I think Mr. Gilpin's Ford
19  Expedition?
20    A.   Yeah.  There were -- one of the
21  installers' recreational vehicles and some RC cars
22  hanging on a board back here.
23    Q.   Okay.  And what are RC cars?

Page 59

1    A.   Remote controls.
2    Q.   Oh, okay.  And those belonged to Trey
3  Robinson?
4    A.   Two belonged to my son, some belonged
5  to Trey.
6    Q.   Okay.  And why were those in the
7  building?
8    A.   Play time.
9    Q.   So nothing to do with the business?
10    A.   No.
11    Q.   Just personal things?
12    A.   Yeah.
13    Q.   Okay.  All right.  So no other cars
14  other than those in there.  We've talked about the
15  antique car?
16    A.   That's it.
17    Q.   And the man that brought it in for
18  service, but as far as any full size cars, no
19  others?
20    A.   No.
21    Q.   Okay.  I noticed when I was looking
22  over your cancelled checks that back in May you
23  changed the locks on the front door.  So why did

Page 60

1  you do that?
2    A.   I had a ten-year-old employee that was
3  burnt out on a job.
4    Q.   What does that mean?
5    A.   He was no longer working for me, so he
6  had all access to the keys, the passwords, security
7  system, safes, everything.
8    Q.   Okay.  What's his name?
9    A.   George McFoley.
10    Q.   How do you spell the last name?
11    A.   M-C-F-O-L-E-Y.
12    Q.   Okay.  McFoley, okay.  And you said he
13  was ten years.  You mean he worked for you for ten
14  years?
15    A.   Correct.
16    Q.   Have you had any difficulty with Mr.
17  McFoley since he left?
18    A.   No.  Other than him not paying me what
19  he owed me, no.
20    Q.   Okay.  Why did he owe you something?
21    A.   Just bad financial management.  A
22  gentleman showed up to repo his VW Beetle and he
23  was like I don't have a way of coming back and

**Michael Barakat**                                                                  **16**

---

Page 61

1  forth to work. I asked the guy what would it take
2  to get the title and he said 900. I agreed with
3  George that he would pay me out of his paycheck
4  once a week until it's paid off and I went ahead
5  and paid the 900 and got the title for him.
6     Q.   Okay.
7     A.   He hadn't paid me rent two months on
8  property that I was renting to him for half price.
9     Q.   So which house was he renting from you?
10    A.   5024 41st Way North.
11    Q.   5024 41st Way?
12    A.   North.
13    Q.   Okay. Do you still own that property?
14    A.   Correct.
15    Q.   And does he still live there?
16    A.   No.
17    Q.   As far as any trouble at the business,
18 did he come back to the business and cause any
19 trouble or --
20    A.   He wouldn't even answer my phone calls.
21 And recently, his phone was disconnected.
22    Q.   Okay.
23    A.   You know, I text him once a month, I

---

Page 62

1  say hey, that money, I still need it, you know, I
2  didn't find it, could you please help me out, 100
3  or 200 there. No response at all.
4     Q.   So did you -- when did you let him go?
5     A.   One morning I was sitting in the office
6  and a customer comes in with a return job, a tint
7  job that there was some bubbles in it and it needed
8  to be taken care of. No -- normal procedure. We
9  offer lifetime warranty. But him being the person
10 behind the counter should verify that we actually
11 did this job by showing the customer's receipt, you
12 know. You got this tinted --
13    MR. LAWRENCE: What was the date that
14 you --
15    A.   I don't know.
16    MR. LAWRENCE: Do you remember the
17 month?
18    A.   No.
19    Q.   Now, you changed the locks in May.
20    A.   Yes, it was --
21    Q.   If I remember correctly.
22    A.   It was a week or so within the time he
23 got out.

---

Page 63

1     Q.   Okay. So around -- some time around
2  May, 2014?
3     A.   Yeah.
4     Q.   And you really hadn't had any
5  interaction with him since?
6     A.   None at all.
7     Q.   Okay. Now, you are aware that the
8  determination has been this was an intentionally
9  set fire?
10    A.   I'm aware that was the determination.
11    Q.   When you first heard that, did you have
12 any thoughts as to who may have done it?
13    A.   No.
14    Q.   The man who brought in the vehicle to
15 be worked on that afternoon, did I understand you
16 to say that he had called and told you he was
17 coming?
18    A.   Yes.
19    Q.   Is this someone that you had done work
20 for before?
21    A.   For years.
22    Q.   So somebody you know?
23    A.   Yes.

---

Page 64

1     Q.   Do you know what kind of business he's
2  in?
3     A.   He's a contractor.
4     Q.   Of what kind?
5     A.   HVAC.
6     Q.   What kind of other jobs have you done
7  for him in the past?
8     A.   I couldn't remember. Every car he's
9  ever bought we either did the tint, the alarm, the
10 remote start, the wheels, the stereo setup on it,
11 accessorizing it.
12    Q.   Okay.
13    MR. LAWRENCE: Can we take a break for
14 a second?
15    MS. WILLIAMSON: Sure.
16    (Brief recess.)
17    Q.   (BY MS. WILLIAMSON:) Okay. I'm
18 looking back at the contents inventory, Exhibit 2,
19 and the second item on here -- forgive me. There's
20 not a lot of this I know what it is, so I just have
21 to ask you. What is a graphic plotter? Is that
22 for the computer system?
23    A.   That's the complete description?

---

**Michael Barakat**                                                                    **17**

Page 65

1    Q.   Look at item two.  That's what I'm
2  asking you about, on Page 1.
3    A.   Graphic plotter with computer system.
4  Have you ever seen cars that have vinyl flames on
5  the windows or names on the back of them?
6    Q.   Yeah.
7    A.   Okay.  This is what the plotter and the
8  computer system do.  You feed it the material.  You
9  insert the letters and it cuts it in any font.
10   Q.   So does that -- is that like a decal --
11   A.   Yes.
12   Q.   -- that goes on the car?  And that's
13 what you use to make it?
14   A.   Yes.
15   Q.   Oh, okay.  And on the designation on
16 here with these things that you say other business,
17 is that what you had when it was The Hookup Shop?
18   A.   Other business is The Hookup Shop as
19 well as business that closed down and auctioned
20 their equipment.
21   Q.   Okay.  What was the name of that
22 business?
23   A.   There was one on Fourth Avenue.  I

Page 66

1  can't remember the name.
2    Q.   You're talking about another business
3  other than one you had --
4    A.   Yes.
5    Q.   -- is where you got that?  Okay.  And
6  that particular thing I was referring to is number
7  seven, air compressor.  You said you obtained it in
8  2011 from another business?
9    A.   Yes, my neighbor's business.
10   Q.   And which neighbor is that?
11   A.   In Ninth Street.  It was called Metro
12 Auto Detail.
13   Q.   Mitchell Auto Detail?
14        MR. LAWRENCE:  Is that Mitchell or
15 Metro?
16   A.   Metro.
17        MR. LAWRENCE:  Metro.
18   Q.   Metro, okay.  Tell me about number 22
19 on Page 2, which is remote control gas powered
20 cars.
21   A.   Yes.
22   Q.   Are those the ones that belonged to
23 someone else?

Page 67

1    A.   Those belonged to my son.
2    Q.   To your son, okay.  And they were down
3  there just for him to play with and not necessarily
4  for resale?
5    A.   The installers and myself.
6    Q.   Played with your son's cars?
7    A.   No, not just with his cars.  Our cars,
8  our airplanes as well.
9    Q.   Okay.  Item 24 on Page 2, it says cash
10 on hand, $6,400?
11   A.   Yes.
12   Q.   Okay.  Tell me where the $6,400 was
13 when the fire happened.
14   A.   5,000 was in a slush box, which is a
15 military artillery shell box that was hid between
16 the walls in my office.  $1,000 was the payroll I
17 cut up for the employees.  It was in my desk.
18   Q.   Okay.
19   A.   And the balance was in the cash
20 register drawer.
21   Q.   Okay.  How much was in your box?
22   A.   5,000.
23   Q.   And how much was the payroll that was

Page 68

1  in the desk?
2    A.   $1,000.
3    Q.   And so there was 400 in the cash
4  register?
5    A.   Correct.
6    Q.   Okay.  Now, when is the last time that
7  you saw that the money was in the box?
8    A.   After the accident was put out.
9    Q.   After the fire?
10   A.   The cash register --
11   Q.   No, I'm talking about the box that was
12 hid in the wall.
13   A.   I never saw the box after the fire.
14   Q.   When was the last time you saw the
15 money in the box?
16   A.   A week or two before.
17   Q.   Okay.  All right.  When did you put the
18 money in the desk for the payroll?
19   A.   Right before I left the Harbor Freight.
20   Q.   And where did that $1,000 come from?
21   A.   That is the daily income plus I
22 normally have petty cash in my pocket to complete
23 the payroll for employees.

**Michael Barakat**                                                    **18**

1    Q.   All right.  And how much were you going
2   to give Trey that day?
3    A.   I can't remember.
4    Q.   And so you don't know how much you were
5   going to give BJ either?
6    A.   I can't remember.  They make money, but
7   they also had -- I had everything written down on
8   my desk, was what I was finalizing before I
9   went to Harbor Freight.
10   Q.   So how are they paid?
11   A.   They are paid salary plus commission.
12  Each job they perform, they break off that job.
13   Q.   All right.  How much is their salary?
14  Are they paid weekly?
15   A.   They're paid weekly.
16   Q.   So how much does Trey get a week?
17   A.   Trey gets about 275 a week for five
18  days week work.
19   Q.   All right.  And what about BJ?
20   A.   He gets about 350, 400 a week.
21   Q.   So what does BJ do that Trey doesn't do
22  that causes him to get paid more?
23   A.   Tint.

1    Q.   Tinting the windows?  All right.  Now,
2   how does their commission work?
3    A.   They get -- on a radio install,
4   depending on how difficult, if it takes 20 minutes,
5   they make 15 bucks.
6    Q.   So it's not a certain percentage of the
7   sales?
8    A.   It is a certain percentage of -- no, it
9   is a certain percentage of the labor.
10   Q.   The labor, okay.  And what percentage
11  is that or does it --
12   A.   Between 15 and 35.
13   Q.   Okay.  So it does vary.  So when you
14  left for Harbor Freight, you hadn't determined how
15  much their pay would be for that week; is that
16  right?
17   A.   No, I have.
18   Q.   You had determined it?
19   A.   Yes.  When I left Harbor Freight or
20  left to --
21   Q.   Before you left for Harbor Freight?
22   A.   Yes, I had broke it down on paper,
23  counted the money.  BJ is always on the right, Trey

1   is on the left on my desk.
2    Q.   Okay.  And did you put it under
3   anything or was the money --
4    A.   No.
5    Q.   -- just out in plain view?
6    A.   Plain view inside the desk drawers.
7    Q.   Okay.  So let's see.  Trey was on which
8   side?
9    A.   Trey is on the right and -- BJ is on
10  the right, Trey is on the left.
11   Q.   Was the money in an envelope?
12   A.   No.
13   Q.   Just -- did it have a paper clip around
14  it or --
15   A.   Paper clip.
16   Q.   Okay.  Paper clipped together.  Was it
17  in anything or just sitting out on top?  So if I
18  opened the drawer on the right --
19   A.   You'll see money.
20   Q.   I would have seen the money, okay.
21  Were either of the drawers locked?
22   A.   No.
23   Q.   Is there any reason you didn't go ahead

1   and give them their pay when they were on their way
2   to Harbor Freight?
3    A.   Yes.
4    Q.   Why?
5    A.   Needed more work done.
6    Q.   You were afraid they might not come
7   back?
8    A.   Well, they needed tools.  I knew they
9   were coming back.  But we wanted to get the easy
10  part done.
11   Q.   Okay.  All right.  Now, Mr. Gilpin
12  brings his vehicle down.  He gives you a call and
13  says I'm coming by.  Did he tell you on the phone
14  what he needed to have done?
15   A.   He said he was driving from Houston and
16  he's smelling funny wire smell coming from the
17  back.
18   Q.   And what did he tell you he wanted to
19  have done?
20   A.   He wanted to get that repaired, find
21  out what the problem is.
22   Q.   That's all he told you?
23   A.   Uh-huh.

**Michael Barakat**                                                                 **19**

---

Page 73

1    Q.   Yes?
2    A.   Yes.
3    Q.   Okay.  After he gets there, did he
4 decide to do other things?
5    A.   Yes.
6    Q.   All right.  What were you -- what were
7 you supposed to do for Mr. Gilpin?
8    A.   I convinced him that the radio that was
9 put in there was put in there wrong and it is
10 mediocre, that I could have him top of the line
11 radio with Internet built in, not just Wi-Fi,
12 Internet built in the radio, replace all the door
13 speakers, strip all the bootleg job wires and
14 install them properly and professionally.
15    Q.   And how much did it cost -- was it
16 going to cost for that job?
17    A.   Close to 25 to $3,000.
18    Q.   Now, this was a -- what, a 2008 vehicle
19 with 180,000 miles?
20    A.   '08 or '09.  I'm not sure.
21    Q.   Really?  Is it unusual for somebody to
22 put that much money into a vehicle that old?
23    A.   It's a $10,000 set of rims on that

---

Page 74

1 truck when it pulled up in the shop.
2    Q.   So not really unusual then for people
3 to do that?
4    A.   No.
5    Q.   And you say this guy does heating and
6 air-conditioning construction?
7    A.   He's got his own company, yes.
8    Q.   All right.  After -- what time did Mr.
9 Gilpin get there?
10    A.   Late in the evening.  I would say 4:30,
11 quarter til 5:00.
12    Q.   Okay.  Was anybody with him?
13    A.   No, but somebody did come pick him up
14 and we told him the job wasn't going to get done
15 that night.
16    Q.   Wasn't going to get done right that
17 minute?
18    A.   Yeah.
19    Q.   Okay.  So did y'all do anything to his
20 vehicle before you left to go to Harbor Freight?
21    A.   Sure.
22    Q.   What did you do?
23    A.   I give help some parts to go in the

---

Page 75

1 door speakers.  I told Trey to disconnect the
2 battery which I thought was the cause of evil, but
3 I don't know if he disconnected the secondary
4 battery which the bootleggers had put in the travel
5 compartment of the truck and hot-wired it to the
6 one under the hood without any insulation.
7    Q.   And when did you make that
8 determination?
9    A.   When I looked at what, you know -- when
10 he first pulled up and I looked to see where the
11 problem might be, what would cause wires to touch
12 wires.  I seen exposed metal, a distribution block
13 with hot wires going in it and there's no plastic
14 or metal or glass covering on top of it.  And it
15 was sitting next to the rear seat belt metal
16 bracket and I told him that's -- if something
17 touches that, it might arc.
18    Q.   Okay.  Rear seat passenger or driver's
19 side?
20    A.   That would be the passenger's side.  I
21 took pictures of it as well.
22    Q.   Okay.  Now, why did you take pictures?
23    A.   I always do.

---

Page 76

1    Q.   What did you take pictures of?
2    A.   Liability that might come to the shop,
3 the wires that were exposed and I thought they were
4 done wrong, bootleg job.
5    Q.   And when did you take those pictures?
6    A.   I took those pictures when I saw the
7 problem that's in the truck.
8    Q.   So that afternoon before you went to
9 Harbor Freight?
10    A.   Correct.
11    Q.   Okay.  And where are those pictures
12 now?
13    A.   On my phone and I sent them to Kirby.
14    Q.   Okay.  Can you send them to me?
15    A.   Sure can.
16    Q.   All right.  I'll give you my e-mail
17 address.
18    A.   I can send them to your phone or
19 e-mail.
20    Q.   It's the same.  It will come in on my
21 office computer and my phone.  How many do you
22 have?
23    A.   Maybe two or three.

---

Page 77

1    Q.   Did you take a picture of anything else
2  other than the exposed wires?
3    A.   Wires that was on the kick panel.
4    Q.   On the what kind of panel?
5    A.   Kick panel.  That's the side -- the
6  driver and passenger door.  There were wires that
7  are not supposed to be there.  I paid attention and
8  saw them, took pictures of them.
9    Q.   All right.  And how many of those do
10  you have?  Or how many photographs?
11    A.   I don't know.
12    Q.   Are they all on your phone?
13    A.   Uh-huh.
14    Q.   Okay.  Do you have photographs of
15  anything else on Mr. Gilpin's vehicle?
16    A.   Just the -- the dash, the way it was
17  set.  And I liked his rims.  I probably took some
18  pictures of his rims.
19    Q.   The dash, the rims, the wires in the
20  doors and the wires -- exposed wires.  Does that
21  pretty much cover it?
22    A.   Yes.
23    Q.   Okay.  Now, was there anything that you

Page 78

1  had to buy at Harbor Freight to do the job on Mr.
2  Gilpin's vehicle?
3    A.   There was a couple of things.
4    Q.   What?
5    A.   The air compressor line.
6    Q.   Okay.  Now, what did you need that for?
7    A.   To hook up to the compressor and get
8  air pressure.
9    Q.   You didn't already have one of those?
10    A.   Well, that's why we went to the
11  80 percent sale, we needed a bunch of tools.  But
12  right there at the moment, we needed some tools to
13  work on this specific vehicle.
14    Q.   That's what I'm asking you.
15    A.   There's a set of installer's kit.  It's
16  fiberglass and plastic tools.  We had to have them
17  so none of the items we take out can get scratched
18  or hurt at the time of removal.
19    Q.   All right.  And that's not something
20  you had already?
21    A.   Those get lost every day, whether in
22  your car, customer's car or get forgotten and get
23  run over.  So we have to have those every week,

Page 79

1  every other week.
2    Q.   So how much does that cost, a set of
3  those?
4    A.   A set of those, about $20.
5    Q.   Okay.  And what else did you need to do
6  Mr. Gilpin's job?
7    A.   Lift the truck up and see if there's
8  any damage that was caused by fires that he thought
9  might have been burning underneath it.
10    Q.   Okay.  What I'm asking you is:  What
11  tools did you have to buy at Harbor Freight to look
12  at his job?
13    A.   Lift jack.
14    Q.   So you didn't have a lift jack?
15    A.   I had one.  I had two.  The second one
16  was not -- it was malfunctioning, so I had to have
17  a sturdy one to lift it on both sides.
18    Q.   All right.  And how much -- did you buy
19  a lift jack at Harbor Freight?
20    A.   I bought everything we needed.
21    Q.   And how much was the lift jack?
22    A.   I don't remember.
23    Q.   Do you have a judgment of about how

Page 80

1  much it should cost?
2    A.   About 80 to $100.
3    Q.   Okay.  And what else did you have to
4  buy?
5    A.   A bunch of other tools.
6    Q.   Can you tell me anything else you
7  needed for Mr. Gilpin's job?
8    A.   I can't remember them.
9    Q.   All right.  And about how much did you
10  spend at Harbor Freight?
11    A.   About $270.
12    Q.   270?
13    A.   Uh-huh.
14    Q.   And how did you pay for it?
15    A.   Plastic, Visa.
16    Q.   All right.  Where is the Harbor Freight
17  location that you went to?
18    A.   This is in Center Point right off of
19  First Avenue North in Center Point by the Walmart.
20    Q.   And did you and BJ and Trey all go
21  together?
22    A.   No.  They left before me.  I had to
23  finish payroll and test a couple of heat guns that

Page 81

1 one of them -- or two of them were bad and take
2 them over there and replace them, get them swapped
3 out while I'm making my purchase.
4 Q. So you made the pictures of the car
5 after Trey and BJ left?
6 A. No.
7 Q. Okay. I'm sorry. I misunderstood you
8 then. Tell me what you just said.
9 A. Your question was did I leave before or
10 after.
11 Q. Right.
12 A. I left after.
13 Q. Okay. And then you said you did
14 something after they left.
15 A. Yeah, I tested --
16 Q. Finished payroll --
17 A. There's a couple of tools that needed
18 to go to Harbor Freight for replacement, swap out.
19 Q. Okay. And did you take those with you?
20 A. Tested those. Yeah, I take one.
21 Q. And what was it?
22 A. Heat gun.
23 Q. What vehicle were you driving that day?

Page 82

1 A. A white van, Ford van.
2 Q. Ford?
3 A. 15-passenger van.
4 Q. Does it have any kind of advertisement
5 on it? Does it have 205 Customs or anything?
6 A. No. Plain white.
7 Q. And is it titled to you?
8 A. Correct.
9 Q. All right. What other vehicles do you
10 own?
11 A. Mercedes.
12 Q. Color?
13 A. Champagne.
14 Q. What year?
15 A. '99.
16 Q. All right. What else?
17 A. BMW.
18 Q. What year?
19 A. X5, '05.
20 Q. 2005?
21 A. Uh-huh.
22 Q. And what color?
23 A. Black.

Page 83

1 Q. Is that an SUV?
2 A. Yes.
3 Q. All right. What else?
4 A. There's 25 cars. Would you like a list
5 of them?
6 Q. Which one -- which ones do you drive?
7 Do you drive all 25?
8 A. Just those. No, I don't drive all 25.
9 Q. Okay.
10 A. I'm driving a Suburban today. It's in
11 my name -- well, not in my -- it's in my wholesale
12 license name, but, you know, that's what I'm
13 driving today.
14 Q. Okay. You said your wholesale license.
15 Do you have a license to sell cars?
16 A. Yeah. I -- I got me one in like --
17 after October 1st just to keep me, you know,
18 preoccupied because that was my life, my baby.
19 Q. Okay. So that's what you're doing now
20 kind of to make money?
21 A. Not really.
22 Q. Of those 25 cars you just talked about,
23 are those things you've acquired since the fire?

Page 84

1 A. Yes, all of them after -- after
2 October 1st.
3 Q. Okay. All right. But at the time of
4 the fire, then you would have either been driving
5 your Mercedes, white Ford --
6 A. Mercedes, the van or --
7 Q. BMW?
8 A. BMW. There's two pickup trucks, Chevy
9 Silverados, don't drive them.
10 Q. Okay. And what does your wife drive?
11 A. The BMW sometimes.
12 Q. And what does she drive the other
13 times? The Mercedes?
14 A. (Witness nods head.)
15 Q. Yes?
16 A. Yes.
17 Q. And what about your son, isn't he 20?
18 A. Yes.
19 Q. Okay. What does he drive?
20 A. Infinity G35.
21 Q. What color?
22 A. White.
23 Q. Is that an SUV or is that like a sedan?

**Michael Barakat**                                                                      **22**

Page 85

1    A.   Two-door.

2    Q.   Two-door, okay.  And what about your --

3  is the next one 18?

4    A.   16.

5    Q.   16, okay.  So not driving yet?

6    A.   No license.

7    Q.   Okay.  All right.  So you're driving

8  your white Ford van.  And did Trey and BJ go

9  together to Harbor Freight?

10    A.   Yes, they rode in one car.

11    Q.   Okay.  Whose car did they take?

12    A.   I don't know.

13    Q.   You said earlier that somebody that

14  owned some other cars were going to make a claim

15  for them being damaged or something?

16    A.   Yes.  We're wall to wall with a car lot

17  next to us.

18    Q.   And what's --

19    A.   And they had some cars parked up

20  against our wall.

21    Q.   What's the name of the car lot?

22    A.   Car Source.

23    Q.   I'm sorry?

Page 86

1    A.   Car Source.

2    Q.   Car Source?

3    A.   Yes.

4    Q.   Okay.  You've got to put the southern

5  accent on it.

6    A.   I try.

7    Q.   All right.  And who owns Car Source?

8    A.   (Witness shrugs shoulders.)

9    Q.   You don't know his name or her name?

10    A.   Adam.  I know his name is Adam.

11    Q.   Okay.

12    A.   And Vivian is the secretary.

13    Q.   Now, whoever's car was left behind

14  between Trey and BJ, was there any damage to their

15  car?

16    A.   Not aware of.

17    Q.   Is there anybody else who has a claim?

18    A.   Trey, BJ and the car lot and Matt.

19  That's it.

20    Q.   Okay.  Now, you said Trey and BJ.  What

21  is their claim?

22    A.   Their tool boxes and their tools.

23    Q.   And you've got that on your list, don't

Page 87

1  you?

2    A.   And the toys that Trey had brought into

3  the shop without my consent.  And I hope he don't

4  get paid for that.

5    Q.   Now, are they on your list as your

6  property?

7    A.   He made a list and sent it over there.

8  I was in -- I mean -- what was it, Michigan the

9  week before and I came back and I was like whose

10  vehicles are in the shop.  He said I'm moving, I

11  don't have room to put them, if you don't mind,

12  I'll just set them here for a week and then take

13  them out.  I said as long as they're titled and

14  clean and no drama is coming from behind them, you

15  have a week to store them over here.

16    Q.   And what is it that was titled?  What

17  would be titled?

18    A.   His recreational vehicles, SUVs, all

19  terrain vehicles.  He brought motorcycles.  I never

20  did take a good look at them.  I just -- you know,

21  I don't go too much in the back, you know.  I just

22  survey it once a day, make sure they cleaned up,

23  make sure there's no clutter.

Page 88

1    Q.   Are the things that belonged to Trey on

2  this 13-page list I'm looking at?

3    A.   Yes, I believe it's the last page of

4  the list.

5    Q.   The -- two Wild Ride -- yeah, Wild

6  Rider 15000 ATVs, so that's Trey's?

7    A.   That's Trey's claim.

8    Q.   Okay.  I tell you what, why don't you

9  take a look at Page 13.  And if you'll just take my

10  pen and put a big X out by anything that belonged

11  to Trey.  I tell you what, just put a --

12    A.   It's all Trey's.

13    Q.   All this is (indicating)?

14    A.   Yeah.

15    Q.   All of Page 13 are Trey's items, all

16  right.  I'm just going to write that at the top.

17  Is he Robinson?

18    A.   Trey Robinson.

19    Q.   Okay.  Now, where are BJ's things?

20    A.   I haven't been able to get him to send

21  me a -- a filled-out claim form.

22    Q.   Okay.  So everything on Pages 1 through

23  12 then are your things?

**Michael Barakat**

23

1     A.   Correct.

2     Q.   Okay.

3     A.   Minus the things I didn't, you know,

4  remember to put on there.

5     Q.   All right.  Now, did you -- is this

6  your handwriting?  Did you do this?

7     A.   That is correct.

8     Q.   Okay.  You made all the entries on

9  there?

10    A.   Correct.

11    Q.   And how did you do it?  Did you go back

12 through the building and write things down?

13    A.   (Witness shakes head.)

14    Q.   Did you go by invoices?

15    A.   Invoices, pictures.

16    Q.   And what kind of pictures did you use?

17    A.   Pictures of the interior of the store,

18 the storage area.

19    Q.   Okay.  Now, where did you get pictures

20 of the interior?

21    A.   I frequently take pictures of all jobs,

22 all building facilities, all my inventory,

23 especially if I'm going to skip town for a day or

1  two, hop to Vegas and come back, I need to know.

2     Q.   So when is the last time you made

3  pictures before the fire?

4     A.   Probably two or three weeks.

5     Q.   And do you still have them?

6     A.   Some of them, yes.

7     Q.   Okay.  Would you send me what you have?

8     A.   I did.

9     Q.   You did?

10    A.   I sure did.  Kirby's e-mail.

11 Everything that was on your request sheet got sent

12 to you.

13    Q.   Okay.  I don't remember any pictures.

14 I'll go back and look.  But --

15    A.   I'll be more than glad to send them to

16 you again.

17    Q.   Okay.  Yeah, whatever you took last

18 before the fire, I would appreciate it if you

19 would.

20    A.   No problem.

21    Q.   Okay.

22        MR. LAWRENCE:  I'll get him to send it

23 to Kirby and get Kirby to send it to you.

1        MS. WILLIAMSON:  Okay.

2     Q.   (BY MS. WILLIAMSON:)  You guys go to

3  Harbor Freight.  How long do you stay at the store

4  between when they left and when you leave?

5     A.   Between seven and 12 minutes.

6     Q.   Okay.  And during that period of time,

7  like you said, you were finishing up the inventory?

8     A.   No.

9     Q.   No?  Not inventory.  Payroll?

10    A.   Payroll.

11    Q.   And then what else did you do?

12    A.   Checked the heat guns.  There's three

13 boxes.  BJ stacked them.  We knew one was working,

14 two were not.

15    Q.   Okay.

16    A.   So I had to plug every one of them to

17 see which one's working and which one is not.

18    Q.   Okay.  What do you use the heat gun

19 for?

20    A.   To heat shrink the tint on the outside

21 of the vehicle so it ain't creased up so when you

22 peel it off, it will lay just like the glass on the

23 inside.

1     Q.   Okay.  So you were going to do tinting

2  on that car as well?

3     A.   What --

4     Q.   Was that --

5     A.   The car that was before it, it was a

6  tint job.

7     Q.   Okay.  So you --

8     A.   But we always keep seven guns to ten

9  guns on hand at any given time.  It's a full

10 stocked shop.  We can't run out of a heat gun or

11 one break down and we tell a $300 customer I am

12 sorry, I apologize dearly, I can't finish your job,

13 here's your money.

14    Q.   Right.

15    A.   So we always kept at least seven

16 handguns that's working.

17    Q.   Okay.  And when did you take the

18 pictures of Mr. Gilpin's car?  Was this after the

19 guys left or was it when Mr. Gilpin was still

20 there?

21    A.   When he was there.  When he was there.

22    Q.   And do you know what kind of vehicle it

23 was that came to pick him up?

Page 93

1    A.   No.  No.  Black, I know.

2    Q.   So you made it out to Harbor Freight
3  and made your purchases before you found out there
4  had been a fire?

5    A.   Correct.

6    Q.   Okay.  How did you find out there had
7  been a fire?

8    A.   On the way back, Trey and BJ were
9  riding in the car in front of me.  They called my
10 cell phone.  They informed me that the last tint
11 job we did was cruising in front of the store and
12 he saw it billowing in flames.

13   Q.   And who was the last tint job?

14   A.   I don't know him.

15   Q.   Okay.

16   A.   Just a pickup truck came in, wanted to
17 get tint.

18   Q.   So you didn't get a call from the
19 police or the fire department?

20   A.   Afterwards I got a call from the
21 lienholder and then I got a call from the police
22 officer.  But we were by the store by then.

23   Q.   Okay.  And who -- you said the

Page 94

1  lienholder.  Which one of them called you?

2    A.   Moe.

3    Q.   Moe called you, okay.  Do they have a
4  business or something in that general area?

5    A.   They own the general area.

6    Q.   Oh, all of it -- all of the general
7  area?

8    A.   Yes.  Tom's Sound is bought from them.
9  Across the street those buildings was bought from
10 them.  Everything just about is their real estate.

11   Q.   So do they have a business that they
12 operate in the area or was he just passing through?

13   A.   They have a business on Oporto Madrid,
14 Premiere Chevy or Pontiac.

15   Q.   So by the time Moe called, you're
16 almost back to the business?

17   A.   Yeah, less than a few blocks away.

18   Q.   When you got there, who all was there?

19   A.   Several fire engines.

20   Q.   Anybody else?  Anybody you know?

21   A.   The neighbors from the car lot next
22 door.

23   Q.   Okay.  Adam and Vivian?

Page 95

1    A.   Yeah.

2    Q.   Did they have people that worked for
3  them over there, too?

4    A.   Yes.

5    Q.   Okay.

6    A.   It was about five of them.  I asked
7  them exactly what happened and then talked to the
8  police officer and then got approached by the news
9  media and declined talking to them.

10   Q.   Do you know which police officer you
11 spoke with?

12   A.   No, but his name is on the police
13 report.

14   Q.   Okay.  Were you presented the police
15 report that night to sign?

16   A.   Yes.

17   Q.   And did you read over the narrative
18 part on the police report?

19   A.   No, I did not.

20   Q.   Well, I tell you, before I get to that,
21 let me ask you about these phone numbers.  Do you
22 know about what time it was when you got back to
23 the building?

Page 96

1    A.   6:00, 6:45.

2    Q.   Okay.  Now, I have the number for you
3  as area code (205) 835-1365.

4    A.   Correct.

5    Q.   Is that your cell number?

6    A.   Correct.

7    Q.   Do you use any other cell phone?

8    A.   No.

9    Q.   Is that a T-Mobile service?

10   A.   Correct.

11   Q.   Okay.  Now, these phone records you
12 sent are really strange because like August the
13 23rd is not all in the same area.  It has like
14 earlier calls before it.  I mean, it's really odd.
15 But at any rate, the first call on your records
16 that are in the general time of when the fire
17 happened is at 5:42, a call to Nectar, Alabama,
18 559-7222.  Is that your home?

19   A.   That is correct.

20   Q.   Okay.  And then you have an incoming
21 call from 541-0356.  Do you know who that is?

22   A.   (Witness shakes head.)

23   Q.   And that would have been at 5:54.

Page 97

1      A.   (Witness shakes head.)
2      Q.   The fire was called in at 4:45.
3      A.   It might have been the police officer.
4      Q.   Okay.  And then the next call is also
5  an incoming call from 617-1162.  Do you know who
6  that is?
7      A.   (Witness shakes head.)
8      Q.   No?  I tell you, what is Trey's number?
9      A.   222 -- 617, that's BJ.  222-0493 is
10 Trey.
11     Q.   493 is Trey.  Okay.  What is BJ?
12     A.   The 617.
13     Q.   617 --
14     A.   1162.
15     Q.   1162, okay.  It looks like he calls in
16 at 5:55.  Would that have been the first time you
17 found out about the fire?
18     A.   That would have been him driving in
19 front of me calling me.
20     Q.   Okay.  And this 541-0356 that was right
21 before that, you don't know who that was?
22     A.   That might have been the police
23 officer.

Page 98

1      Q.   Okay.  5:58, there's an incoming call
2  from 937-8935.  Do you know who that is?
3      A.   No.
4      Q.   Then at 6:40, 902-3076.
5      A.   (Witness shakes head.)
6      Q.   No?
7      A.   No.
8      Q.   And then another call to your house.
9  Then you have an incoming call from 835-1364.
10 That's 7:16.  Do you know who that is?
11     A.   No.
12     Q.   All right.  Let's think back.  You said
13 you got a call from BJ and then you got a call from
14 Moe.  Did he call you after BJ did?
15     A.   Yes.
16     Q.   Okay.  There's two unidentified calls
17 right about the same time.  What about 617-7207?
18     A.   No.
19     Q.   You don't know that one either?
20     A.   (Witness shakes head.)
21     Q.   229-0435?
22     A.   Trey.
23     Q.   Okay.  You gave me 0493 a minute ago.

Page 99

1  I think 0435 is correct?
2      A.   It might have been his and his wife's
3  numbers.
4      Q.   Okay.
5      A.   I know the 222 is the prefix to his
6  number.
7      Q.   And what is his wife's name?
8      A.   Don't know.
9      Q.   All right.  A couple more.  446-2365?
10     A.   No.
11     Q.   800-4273, that would be a Bessemer
12 number.
13     A.   (Witness shakes head.)
14     Q.   400-4273?
15     A.   (Witness shakes head.)
16     Q.   It looks like you might have dialed
17 800-4273 and then changed it and dialed --
18     A.   The board up -- the board up company to
19 come and secure the store.
20     Q.   Okay.  That's 1 (800) BOARDUP, though,
21 isn't it?
22     A.   Yes.
23     Q.   Okay.  But this is a 205 number.

Page 100

1  400-4273.
2      A.   (Witness shakes head.)
3      Q.   No?  Okay.  Do you recall sending any
4  text messages to Trey that night?
5      A.   Don't recall.
6      Q.   222-4812?
7      A.   (Witness shakes head.)
8      Q.   Whoever that was, it was an incoming
9  call and you spoke with them for 18 minutes at 9:22
10 on the night of the fire.  Any ideas who you may
11 have spoken with that long?
12     A.   (Witness shakes head.)
13     Q.   Did you speak to anybody from EMC on
14 the night of your fire?
15     A.   Could have.
16     Q.   Okay.  How did you report the claim and
17 when?
18     A.   I don't remember.
19     Q.   You don't remember if you called your
20 agent or if you called a 1 (800) number?
21     A.   It was an 800 number.
22     Q.   Okay.  And when did you make that call?
23     A.   I don't remember.

**Michael Barakat**                                                                26

Page 101

1    Q.   Who was the first person that you met
2  with or talked to from EMC?
3    A.   Adjustor Morgan.
4    Q.   Morgan Thompson?
5    A.   (Witness nods head.)
6    Q.   Okay.  And did you speak with him by
7  phone first and then meet him in person?
8    A.   I believe so.
9    Q.   Okay.  And do you recall when he came
10  out to the business?  What was the day?  Was it the
11  day after the fire?
12    A.   Don't recall.
13    Q.   Okay.  And who else from EMC did you
14  meet with at any -- or speak with at any time?
15    A.   That's it, that I can think of.
16    Q.   Okay.  Did you talk with Ms. Jewel
17  Stubbs that's with me here today?
18    A.   Yes, I did.
19    Q.   Okay.  So you spoke with her on the
20  phone?
21    A.   On the phone.
22    Q.   Okay.  And what about Will Smith, the
23  origin and cause?  You met him in person, didn't

Page 102

1  you?
2    A.   Yes.
3    Q.   Okay.  What about Mr. Tony Bishop, the
4  electrical engineer?  Did you meet with him?
5    A.   No.
6    Q.   Okay.  Now, the business across the
7  street, I Hang TVs, is that the name of it?
8    A.   Yes.
9    Q.   It's my understanding they have a video
10  of your building right before the fire.  Now,
11  you've seen it, right?
12    A.   Correct.
13    Q.   There were some other cars that came in
14  front of the building.  Like you told me you had a
15  black SUV and you thought Mr. Gilpin was picked up
16  by somebody in a black car.  Did you see the black
17  SUV on the video when you looked at it?
18    A.   I didn't say an SUV.
19    Q.   You did not?
20    A.   (Witness shakes head.)
21    Q.   Okay.  I didn't say you said it.  I
22  said did you see it?
23    A.   I said it might have been a black

Page 103

1  vehicle.  I don't know what kind of vehicle it was.
2    Q.   All right.  Did you see any other
3  vehicles in front of your business after you left?
4    A.   White Honda Accord, belongs to BJ.
5    Q.   The Honda Accord?
6    A.   (Witness nods head.)
7    Q.   And what color is his car?
8    A.   White.
9    Q.   Okay.  So they must have gone in Trey's
10  car then to Harbor Freight?
11    A.   Yes.
12    Q.   Okay.  Other than that, did you see any
13  other vehicles come up to your business after you
14  left, like that somebody was operating?
15    A.   No.
16    Q.   Okay.  I'm a little bit confused by
17  these phone calls.  Did you tell me that the police
18  officer called you on the phone before you got to
19  the building or not?
20    A.   I'm thinking so.
21    Q.   He did?
22    A.   (Witness nods head.)
23    Q.   The same one that did the report?

Page 104

1    A.   Correct.
2    Q.   Okay.
3         (Whereupon, Exhibit 4 was marked
4         for identification.)
5    Q.   Exhibit 4 is the incident report that I
6  have from the police department.  And I asked you
7  earlier if you had read the narrative part before
8  you signed it and you told me no, right?
9    A.   (Witness nods head.)
10    Q.   (Indicating.)
11    A.   Right.
12    Q.   Okay.  Would you please read it now,
13  Mr. Barakat, and just tell me if everything that's
14  written in the narrative section is true and
15  correct.
16    A.   (Examining document.)  Okay.
17    Q.   Is everything that's written in the
18  narrative part true and correct?
19    A.   True.
20    Q.   Okay.  Now, the cell phone records I've
21  got says it's for Ihab, 835-1365.  Is there -- are
22  there other numbers on this account?
23    A.   No.  Well, my mom and dad and my wife.

**Michael Barakat**                                                                                27

Page 105

1    Q.   All right.  And what are mom and dad's
2  numbers?
3    A.   Normally they just say Mom and Dad on
4  the phone.  You need digits?
5    Q.   That would be nice.
6    A.   (Looking in cell phone.)  Momma is
7  567-3890.
8    Q.   All right.  What's Dad?
9    A.   Should be 567-3891.
10   Q.   Okay.  And that's 205 exchange?
11   A.   Correct.
12   Q.   All right.  And what's Blake's number?
13   A.   427-0450.
14   Q.   Okay.  And none of your children are on
15 there?
16   A.   No.
17   Q.   You say that like of course not.
18   A.   Why do they need a cell phone?
19   Q.   I thought their cell phones was
20 attached to their heart.  If they didn't have it,
21 it would stop beating.
22   A.   I want to see what would happen if we
23 get disconnected from one day, from the Cloud, from

Page 106

1  the Internet, from --
2    Q.   Everybody would be mad, wouldn't they?
3  Well, I keep looking for Page 5 of these records
4  and I haven't found it yet.  So I've got five pages
5  of cell phone records except I only have through
6  Page 4, so when we take the next break, would you
7  mind seeing if you have Page 5?
8        MR. LAWRENCE:  I'll look right now.
9        MS. WILLIAMSON:  Okay.  Good.
10       MR. LAWRENCE:  My understanding, this
11 is what has been produced.  I'm assuming you show
12 one of five?
13       MS. WILLIAMSON:  Yes.
14       MR. LAWRENCE:  All right.
15       MS. WILLIAMSON:  Because see, this is
16 strange.  On Page 1, it starts with August 23rd,
17 which is the date of loss and then on Page 22 -- I
18 mean Page 2, it has August 22nd calls.
19   A.   Yeah, it was confusing trying to print
20 those out, so I went ahead and printed everything
21 before and after and during just to cover all the
22 bases.
23       MS. WILLIAMSON:  Oh, I see what this

Page 107

1  is.  These are all text messages.  Okay.
2        MR. LAWRENCE:  Give me a second.
3        MS. WILLIAMSON:  Go off the record a
4  minute.
5        (Off-the-record discussion.)
6        (Whereupon, Exhibit 5 was marked
7         for identification.)
8    Q.   (BY MS. WILLIAMSON:)  Okay.  Exhibit 5
9  is the phone records we've been discussing for your
10 cell phone, (205) 835-1365.  And you've assured me
11 that that's the only one you have, right?
12   A.   Yes.
13   Q.   Okay.  And what is the number at the
14 store?
15   A.   (205) 251-4136.
16   Q.   Okay.
17   A.   Fax number is (205) 326-4555.
18   Q.   Okay.  And are you planning to rebuild
19 your business on the same location?
20   A.   Yes.
21   Q.   Don't have any plans to move to a
22 different one?
23   A.   My business is location-driven

Page 108

1  geographically.  I spent over $10,000 a month in
2  advertising.
3    Q.   And was that to Angel or somebody?  Or
4  is that one of your suppliers?
5    A.   Angel is my supplier.
6    Q.   Okay.  I noticed one thing on your
7  contents inventory, it said a painting.  I'm
8  assuming that's the 205 Customs --
9    A.   Custom oil painting by Blake.  She's an
10 artist.
11   Q.   Your wife?
12   A.   She stays at home.  Highly sought-after
13 paint -- art work.  This was done over six months
14 just for me.
15   Q.   And where is it?
16   A.   It's in the store.
17   Q.   Okay.  Where, though?
18   A.   When you walk in, far left.  It's black
19 now.
20   Q.   Okay.
21   A.   Walk in (indicating), showroom
22 (indicating), it occupies the whole wall up and
23 down, four-by-eight.

Page 109

1    Q.   Okay.  Four-by-eight painting.  And
2  what is it?  What is the subject of the painting?
3    A.   Downtown, Sloss Furnace, cars,
4  customizing them, people, friendly, crossing roads,
5  coming -- the area completely changed in the last
6  two years, so we're loving it.
7    Q.   So what about the price you put on
8  there?  I couldn't tell exactly what you had
9  priced --
10    A.   You couldn't pay me $300 million for
11  it, so the price on there is nothing.
12    Q.   Well, I just wanted to know what it was
13  because I can't tell --
14    A.   I don't know it either.  I didn't know
15  what price to put on there.  It's something
16  sentimental.  I know you got your limits.  I know
17  you'd pay for some, other you won't, but hey --
18    MR. LAWRENCE:  Just answer the
19  questions.  Okay?
20    THE WITNESS:  Yes, sir, master.
21    Q.   I apologize.  My question was not
22  clear.  All I really wanted you to do was tell me
23  what that number is (indicating).

Page 110

1    A.   $250,000.
2    Q.   Okay.  Well, that's what I thought.  I
3  couldn't tell if it was 25,000 or 250,000.  And we
4  were looking at Exhibit 3, I believe that was
5  Page 12.  Yes, Page 12, item 187.  Okay.
6        (Whereupon, Exhibit 6 was marked
7          for identification.)
8    Q.   I'm going to show you what I'm marking
9  as Exhibit 6.  This is a September 25th letter to
10  Kirby, Mr. Farris, from the forensic accountant
11  that EMC retained to try to determine your loss of
12  business income.  And it asks for a lot of records
13  on there.  To your knowledge, have all of those
14  been provided to the forensic examiner?
15    A.   I'd have to read it first.
16    Q.   Okay.  Would you do that?
17    A.   Sure.
18    Q.   And if you see anything on there that
19  you haven't provided, just tell me what those are.
20  You can just make a mark by it as you read along.
21    A.   (Examining document.)
22    MR. LAWRENCE:  Did you provide
23  everything you had?

Page 111

1    A.   Yes.
2    MR. LAWRENCE:  Okay.
3    Q.   So what on there did you not provide?
4    A.   I don't know.
5    Q.   Is there anything that you just read
6  through on Exhibit 6 that either doesn't exist or
7  for some reason you did not give it to the forensic
8  accountant?
9    A.   I'm not aware of it.
10    Q.   Okay.
11    A.   I didn't know there was a forensic
12  accountant.
13    Q.   So did you give the things listed on
14  here to Mr. Farris?
15    A.   I have a list of things and items to
16  provide Mr. Farris and I have done my best in
17  providing every single one of them that I could.
18    Q.   Okay.  All right.  The forensic
19  accountant has looked over the things and they have
20  several questions that they wanted me to ask you to
21  assist them in trying to, I guess, calculate the
22  loss of business.  What documentation did you use
23  to determine the sales of $60,781 reported on your

Page 112

1  2013 income tax return?
2    A.   Sales receipt books.
3    Q.   Okay.
4    A.   And information given to the
5  accountant.
6    Q.   Okay.  And you've already told me that
7  the receipt books have every transaction that you
8  do in the business, correct?
9    A.   Right.
10    Q.   But you don't necessarily report all of
11  that information to your accountant?
12    A.   Nor do I necessarily write down a quick
13  labor job.
14    Q.   Okay.
15    A.   Somebody comes in and says my system
16  quit, 50 bucks, fuse, out the door.
17    Q.   Okay.  So you don't record everything
18  in the receipt books?
19    A.   Correct.
20    Q.   Okay.  I know the answer to some of
21  these, but I'm going to ask them just as they're
22  written down.
23    A.   Please do.

**Michael Barakat**                                                                 **29**

Page 113

1    Q.   Did you report all sales on the 2013
2  Federal income tax return?
3    A.   All sales on the income tax -- no.
4    Q.   What documentation is available to
5  support any sales that were not reported on the
6  2013 Federal income tax return?
7    A.   Sales receipts books.
8    Q.   Okay.  But that may or may not be --
9    A.   Burnt.
10    Q.   -- burnt, okay.
11    A.   We have to look.
12    Q.   All right.  Would you look and see if
13  the sales receipt book for particularly the area --
14    A.   I'm scared to go in there.  Everything
15  is so jagged.
16    Q.   Well, at some point, somebody has got
17  to go in there to start cleaning up, right?
18    A.   Well, I told the demolition man to come
19  and wipe everything off the face of the earth.
20    Q.   Well, you understand that anything that
21  you can come up with that would aid in determining
22  that your loss of business income exceeds what is
23  reflected on the documents we have would be to your

Page 114

1  advantage?
2    A.   Okay.
3    Q.   So if you do look and find something
4  that might be of assistance, would you give it to
5  your lawyer?
6    A.   Most definitely.
7    Q.   Okay.  I think we discussed this
8  already, but how was the beginning inventory of
9  $4,000 and the ending inventory of $10,000 that
10  were reported on the 2013 Federal income tax return
11  determined?
12    A.   Guesstimating by the accountant.
13    Q.   Okay.  Now, you told me that you gave
14  her the numbers?
15    A.   Uh-huh.
16    Q.   So what is she guessing about?
17    A.   2013 to 2014?
18    Q.   Yeah.  Your 2013 return, it said that
19  your inventory at the beginning of the year was
20  $4,000, your inventory at the end of the year was
21  $10,000.
22    A.   Okay.
23    Q.   So how were those numbers determined?

Page 115

1    A.   I don't know.
2    Q.   I'm sorry?
3    A.   I don't know.
4    Q.   What documentation did you use to
5  determine the beginning and ending inventory
6  reported on the 2013 return?
7    A.   I count.
8    Q.   You counted, but you didn't necessarily
9  report what you had?
10    A.   No.
11    Q.   I'm going to put down "but he didn't
12  accurately report the inventory".
13    A.   Go ahead.
14    Q.   Is that true?
15    A.   I mean, I didn't report it accurately,
16  so that would be correct.
17    Q.   Okay.  How often did you perform a
18  physical inventory count?
19    A.   Once a year.
20    Q.   You told me that the last one you did
21  was in November?
22    A.   Yes.
23    Q.   Is that when you normally did it?

Page 116

1    A.   Yeah.  Towards the end of the year.
2    Q.   Of those periodic physical inventory
3  counts, did you retain documentation showing what
4  you had?
5    A.   No.
6    Q.   After you did the count, what did you
7  do with the list you made or however you kept up
8  with it?
9    A.   Disposed of it.  Didn't keep up with
10  it.
11    Q.   Okay.  This is a copy of your profit
12  and loss for 2013.  Maybe that will help.  The next
13  question is:  How was the purchase amount of
14  $23,514 reported on the 2013 Federal income tax
15  return determined?  And they're talking about the
16  cost of goods sold, which would be on Page 2 of the
17  return that I've given you.  Do you see the cost of
18  goods sold?
19    A.   Uh-huh.
20    Q.   How was that figure determined?
21    A.   No idea.
22    Q.   What documentation did you use to
23  determine the purchase amount reported?

Page 117

1      A.   Some sales receipts.

2      Q.   Did you and your accountant discuss

3  what number would be put on your tax return for the

4  cost of your inventory?

5      A.   No.

6      Q.   Did the purchase amounts reported on

7  the 2013 Federal income tax return include all

8  credit card purchases?

9      A.   Should, yes.

10      Q.   What about check purchases?

11      A.   We don't take checks.

12      Q.   You don't take checks, okay.  And does

13  the amount include all cash purchases?

14      A.   No.

15      Q.   What was included in the advertising

16  expense of $18,350 reported on the 2013 Federal

17  income tax return?

18      A.   Radio, media, TV, magazines,

19  billboards.

20      Q.   Why don't you tell me the companies

21  that you paid for that?

22      A.   Lamar Advertising -- Outdoor

23  Advertising, Cox Broadcasting, which is a different

Page 118

1  company name now.  American Classified.  104.1, the

2  Beat, which is a subsidiary of some conglomerate

3  media company.  Charter Media on TV.

4      Q.   I did see a $1,000 check to Charter in

5  some of the cancelled checks.

6      A.   Yeah, that's just a monthly check to

7  them.

8      Q.   Okay.  What documentation did you use

9  to determine the items and amounts including --

10  included on the list of inventory items?  I think

11  they're referring to Exhibit 2.

12      A.   Sales receipt and pictures.

13      Q.   Okay.  Now, the pictures that you're

14  talking about are the ones we already discussed

15  that you're going to send to me, right?

16      A.   That's correct.  I have sent to you

17  already.

18      Q.   Okay.  But you sent --

19      A.   To Kirby.

20      Q.   To Kirby, correct.  Sales receipts,

21  again, we're talking about the booklet that may --

22  books that may or may not be --

23      A.   No, no, no.  These are invoices from my

Page 119

1  suppliers and the people I purchase from that show

2  the amount of inventory I'm buying and what it cost

3  and how often.

4      Q.   Purchase sales receipts, okay.  They

5  noted the list of inventory items claimed including

6  -- included multiple items purchased from Angel

7  Distributing in 2014, but there were no

8  corresponding vendor invoices.

9      A.   E-mail, forwarded to Kirby.

10      Q.   Okay.  You sent those by e-mail?

11      A.   There's a ton of suppliers and receipts

12  that -- in the e-mail I forwarded to Kirby.

13      Q.   Okay.  But are you certain that the

14  2014 invoices from Angel Distributing were included

15  in that?

16      A.   Positive.

17      Q.   Okay.  All right.  Were there vendor

18  invoices from TW House in 2014?

19      A.   TW House, the wholesale house, yes.

20      Q.   Okay.  And you're sure you sent those

21  to Kirby?

22      A.   Yes.  Hey, they're in a yellow manilla

23  envelope.

Page 120

1      Q.   And what's the name of it, the

2  warehouse?

3      A.   TW House is The Whore House.

4      Q.   Is the what?

5      A.   The Whore House.  They prostitute all

6  electronics around the United States.

7      Q.   That's what I thought you said.

8      A.   That's what it's called.

9      Q.   TW House, okay.  And where are they?

10      A.   Located in Hicksville, Ohio and

11  distributing centers in Jacksonville, Florida and

12  California.

13      Q.   So where do you order from?

14      A.   I order through Ohio.  It ships out of

15  Ohio or Jacksonville, Florida.

16      Q.   Okay.  Did your items that you

17  purchased increase from 2013 to 2014?

18      A.   I haven't gauged it.  I couldn't tell

19  you.

20      Q.   What documentation did you use to

21  determine the amounts reported on your monthly

22  sales tax returns?

23      A.   The accountant determined that.

**Michael Barakat**                                                    **31**

Page 121

1    Q.   And what did she use to determine that?

2    A.   My check stubs, my expenditures.

3    Q.   Okay.  Now, she would be reporting your

4 monthly sales.  Now, how would she do that based on

5 your check stubs?

6    A.   Okay.  I paid this many checks, I

7 bought this many items, I had this many sales.

8 That's how she did it.  Plus take the credit card

9 sales and add them up with some of the cash sales.

10   Q.   Okay.  And who determines how much of

11 those cash sales go in the pot?

12   A.   She does.

13   Q.   Okay.  It's all on her then?

14   A.   Yes.

15   Q.   How do you pay your sales tax when she

16 was doing it?  I noticed there was several checks

17 to Harbison Accounting.

18   A.   She handles all that.  She gives me a

19 total.  I write her one check.

20   Q.   Okay.  So she actually makes the

21 payment for you to Jefferson County?

22   A.   Everything, yes.

23   Q.   Okay.  And she fills out the monthly

Page 122

1 sales tax return?

2    A.   Everything.  I don't see that

3 paperwork.

4    Q.   And we both know the answer to this.

5 But did you report all sales on the monthly sales

6 tax returns?

7    A.   No.

8    Q.   And what documentation is available to

9 support any sales not reported on the monthly sales

10 tax returns?

11   A.   Receipt sale books.

12   Q.   May be burned?

13   A.   No.

14   Q.   Sales --

15   A.   Big box of them with Morgan.

16   Q.   Okay.  I'm talking about the sales that

17 were not reported on the sales tax returns.

18   A.   Yeah, they will be in the sales

19 receipts books which are in boxes that are stacked

20 in the store.

21   Q.   Okay.  I'm specifically talking about

22 2013 and 2014.  Where would those be?

23   A.   In the store.

Page 123

1    Q.   Okay.  Possibly burned or are they --

2    A.   I haven't checked.

3    Q.   Okay.  All right.  Why were no sales

4 reported on your August, 2014 sales tax return when

5 the loss didn't occur until August 23rd?

6    A.   It was and it was paid.

7    Q.   Okay.  Here's what was filed, which

8 I'll mark as Exhibit 7.

9         (Whereupon, Exhibit 7 was marked

10        for identification.)

11   A.   Okay.  I just have to get back with the

12 accountant and see what happened there.  I have no

13 hand or say-sos in these.

14   Q.   You have no what?

15   A.   Hand or say-sos.  I just say take care

16 of the taxes and give me a check and I'll sign it.

17   Q.   So does she have your checkbook?

18   A.   No.  I have my checkbook.  She'll come

19 to me to the office and she will say this is what

20 you owe.  I don't know what her fees are.  I don't

21 know what the taxes are.  I just write a blank

22 check and sign it.

23   Q.   Okay.  Some of those checks had on

Page 124

1 there various amounts, I guess for her fee and then

2 for sales tax and whatever?

3    A.   Some of them are fees, some of them are

4 licenses.  Those amounts I do know.

5    Q.   Okay.  Was the business in operation

6 from August 1st to August 22nd?

7    A.   Correct, yes.

8    Q.   You'll be happy to know we're almost

9 finished with this list.  Okay.  They're asking for

10 additional documentation and the first thing is

11 your Federal income tax for 2012 with all schedules

12 of income and expenses.  Do you have that?

13   A.   Morgan.

14   Q.   You've already provided that for

15 Morgan?

16   A.   (Witness nods head.)

17   Q.   Okay.  Do you know about when it was

18 you gave him the 2012?

19   A.   That first, second week after the

20 accident.

21   Q.   Same --

22   A.   I got in touch with the accountant, got

23 in touch with her and they corresponded, you know,

Page 125

1  without my knowledge.
2      Q.  Okay.  Now, are you sure?  Because we
3  have 2013, but not 2012.
4      A.  I would just have to call her and find
5  out.
6      Q.  Okay.  And if she has not provided it,
7  would you tell her that it's okay to do so?
8      A.  Yes, ma'am, I would be happy to.
9      Q.  Okay.
10     A.  2012.
11     Q.  Okay.  Let's see.  They would like you
12 to sign the attached Form 4506 which would
13 authorize them to obtain copies of your Federal
14 income tax returns from the IRS, which was actually
15 filed.  Would you have any objection to doing that?
16     A.  None at all.
17     Q.  Okay.  All right.  There's 4506.  And
18 they're also asking you to sign the release which I
19 just showed to your attorney that would permit them
20 to obtain financial records, if any, of the
21 documents requested above that may have been
22 destroyed as a result of the loss.  And I think
23 that most of what we were discussing would have

Page 126

1  been your receipt books and may have been
2  additional invoices from some of your suppliers.
3  So would you have any problem with signing the
4  authorization?
5      A.  Not at all.
6      Q.  Okay.  And then the last thing is
7  copies of the business' cancelled checks for 2013.
8  I think the cancelled checks I saw were from 2014.
9      A.  That was everything from PNC.  My
10 banker from Wells Fargo decided he's going to hop
11 ship to PNC.  He calls me.  He said the grass is so
12 much greener, let's get your account at PNC.  So we
13 went with PNC.
14     Now I went back to the branch, Wells
15 Fargo downtown, and I requested that the account be
16 dug up and have check stubs on 205 Customs from
17 Ninth Street and he said that account was closed
18 and it's been closed over two years, I can't get
19 you any information.  His name is Johnny Hakiam.
20 He's the general manager at the Wells Fargo
21 downtown.
22     Q.  What's the last name again?
23     A.  H-A-K-I-A-M.

Page 127

1      Q.  Okay.  All right.  Well, that's the
2  questions that they had, the forensic accountant.
3      A.  Okay.
4      Q.  So if you would just sign both of
5  those.
6      MS. WILLIAMSON:  And do you want to get
7  a copy and we'll attach it to the record?
8      MR. LAWRENCE:  Sure.
9      MS. WILLIAMSON:  And then I will send
10 the originals to the forensic accountant.
11     A.  Sign right here.  Put home address or
12 business address?
13     Q.  (BY MS. WILLIAMSON:)  Probably business
14 address.  Well, wait a minute.  Is that the
15 authorization?  Did your bank records come to your
16 home or come to the business?
17     A.  Which accounts?
18     Q.  The one that we're trying to get.
19     A.  Wells Fargo?  They came to the
20 business.
21     Q.  Okay.  Well, it probably should have
22 your business address there then.
23     A.  I don't remember my Federal ID, but I

Page 128

1  wrote my Social Security on there.
2      Q.  It will be on your tax return.  That's
3  it right there (indicating), isn't it?
4      A.  Yes.  Thank you.
5      Q.  All right.  Who Hassan Barakat?
6      A.  Hassan Barakat, that was my brother.
7      Q.  Was your brother?
8      A.  Is my brother.
9      Q.  Okay.  So he had an interest in the
10 business up until --
11     A.  In 2005 when we moved to Ninth Street,
12 he got in with me as a partner, but then he decided
13 Alabama was not the -- he was playing Old McDonald
14 had a farm, his buddy that raises goats and milks
15 them.
16     MR. LAWRENCE:  Just answer the
17 question.  If he's no longer a partner, just say
18 he's no longer a partner.
19     A.  No longer a partner.
20     Q.  Okay.  Does he still live in the area?
21     A.  He's in Houston.  No.
22     Q.  None of your brothers or your sister
23 live here?

**Michael Barakat**                                                    33

Page 129

1    A.   No.

2    Q.   The painting that your wife did for

3  you, it looks like it was the farthest away from

4  where the fire was.  Have you tried to take it out

5  and clean it?

6    A.   Have I tried -- if I could get to it.

7    Q.   Yeah.  It's possible it may clean.

8    A.   If I could get to it.

9    Q.   Yeah.

10   A.   There is no access.

11   Q.   Okay.  You can't go right in the front

12 door?

13   A.   Yeah, but once you get in the front

14 door, the ceiling has collapsed.  The showcases are

15 in the ground.  The rim racks are everywhere.

16 You'd have -- just like I said when I first caught

17 that first nail, that was the last time I went in

18 that shop.

19        (Whereupon, Exhibit 8 was marked

20         for identification.)

21   Q.   Exhibit 8, I have a photograph.  Is

22 this the entrance right here that we were talking

23 about on the diagram that --

Page 130

1    A.   Correct.

2    Q.   That's where you drive your car in for

3  service?

4    A.   Correct.

5    Q.   So that's -- Exhibit 8 is the front

6  view from First Avenue North?

7    A.   Yes.

8    Q.   Okay.  Now, when you left to go to

9  Harbor Freight that day, you locked the front door?

10   A.   Correct.

11   Q.   Is there a back door entry?

12   A.   Correct.

13   Q.   Did you lock it?

14   A.   No.

15   Q.   Okay.  Where is the back door entrance?

16   A.   Front (indicating), bay (indicating).

17 This is back door entrance with rollup on the back

18 inside and metal bars here (indicating).

19   Q.   Okay.  And this appears to have a

20 rollup on the front, correct?

21   A.   That's a rollup on the front.  That's

22 closed.

23   Q.   Okay.  And when you close it, is it

Page 131

1  automatically locked?

2    A.   No.  We have to latch it.

3    Q.   Did you latch it when you left?

4    A.   I didn't.

5    Q.   Okay.  Do you think Trey or BJ did?

6    A.   More than likely, yes, they have.

7    Q.   Okay.  Now, I read something about

8  latching the gate or closing some kind of a gate.

9    A.   This rollup was open (indicating)

10 because we were working on Expedition right here

11 (indicating).

12   Q.   Okay.

13   A.   And when it was time to go to Harbor

14 Freight, I said BJ, why don't you roll that door

15 down.  He was like why, we're just coming right

16 back.

17   Q.   So when you went back --

18   A.   The rollup was open.  The bars were

19 closed.

20   Q.   Okay.  So those bars -- somebody

21 couldn't open the bars from the outside?

22   A.   Unless the locks are unlocked.

23   Q.   Do you know whether the locks were

Page 132

1  locked or not?

2    A.   No.

3    Q.   Do you know how the firemen made first

4  entry into the building?

5    A.   No.

6    Q.   Now, how did it come about that you

7  increased the coverage on the building I guess in

8  2013?  Did someone come out and inspect the

9  building, somebody from the insurance?

10   A.   Yes.

11   Q.   Okay.  Was it Michael Conour, C --

12   A.   Michael Conour.

13   Q.   Conour?

14   A.   Yes.

15   Q.   And who is he exactly?  Because he's

16 with Insurance Coverage, Inc.

17   A.   Who is she?

18   Q.   Oh, it's a she?  Okay.  So what was the

19 purpose of her visit?

20   A.   We moved from Ninth Street.  I advised

21 her that we're no longer going to be insuring Ninth

22 Street location.  She said what is your new

23 location dimensions, material it was built out of,

**Michael Barakat**                                                    **34**

Page 133

1  I need to come inspect it. And with Michael -- are
2  you familiar with Michael?
3       MS. STUBBS: Never met her, but I've
4  talked with her on the phone.
5       A.   Don't meet her. All she's got to do is
6  do this (indicating) and you're signing your life
7  away. I honestly didn't know -- they took
8  pictures. She was with another gentleman. They
9  went in the business, took pictures. They said
10 this has to be updated, the -- the price will go
11 down because you're now in a block concrete
12 building, your coverage will be reduced -- or the
13 premium will be reduced, but the coverage will
14 still be the same. But they never did advise me
15 that I'm in a bigger location that I needed more
16 coverage. However, none of that I paid attention
17 to up until now. I just signed when she came.
18      Q.   How many square feet are in this
19 building, do you know?
20      A.   One of the contractors said it's 50 by
21 80. The other guy swears it's 50 by 60.
22      Q.   So it's either 3,000 square feet or
23 4,000 square feet, depending on who you're talking

Page 134

1  to?
2       A.   Yes.
3       Q.   When Michael and this gentleman came
4  out, did they measure the building?
5       A.   Yes.
6       Q.   But from your own personal knowledge,
7  you don't know the square footage of the building?
8       A.   No.
9       Q.   Does that look like the front of it as
10 of 2013?
11      A.   (Examining photograph.) No. This is
12 Ninth Street.
13      Q.   Oh, that's Ninth Street?
14      A.   Yeah.
15      Q.   That's not even this location?
16      A.   That's the old location.
17      Q.   Okay. 251-4136, is that a number --
18      A.   Same phone number carried over from one
19 location to the next.
20      Q.   It looks like it's got the same entry
21 on that side. I thought it was the same place.
22      A.   I get lucky.
23      Q.   Okay.

Page 135

1          (Whereupon, Exhibit 9 was marked
2          for identification.)
3       Q.   Exhibit 9, we were talking about a
4  photograph that I got in the underwriting file and
5  you tell me this is the Ninth Street location?
6       A.   That's the Ninth Street.
7       Q.   Okay.
8       A.   They come and took pictures of First
9  Avenue.
10      Q.   As far as square footage, was the
11 building that you're in now bigger or smaller than
12 this Ninth Street location?
13      A.   To me it was bigger.
14      Q.   Okay. Why do you say to me?
15      A.   I had more space to store stuff, more
16 space for my showroom, for my customers, two
17 bathrooms, plenty of space to work on the cars in
18 the back other than the lot itself being --
19 starting at First Avenue North and ending at the
20 railroad track on Morris Avenue.
21      Q.   Okay. Now, there was another article
22 that I found on the Internet that -- it's a report
23 apparently from one of the news services and it

Page 136

1  says, "The owner of the business, who declined to
2  give his full name, said his business was open
3  today, but he had left about 4:30 p.m. to go get
4  some tools at a hardware store in East Lake." Now,
5  is that true?
6       A.   Nothing you read on media is true.
7       Q.   No, but I'm asking you what I just
8  read --
9       A.   Not true.
10      Q.   Okay. What is not true about what I
11 just read?
12      A.   Everything they wrote down. I never
13 spoke to anybody that day.
14      Q.   Okay. So you didn't speak to anybody
15 and decline to give your name?
16      A.   Declined to give anybody my name or
17 statement or anything.
18      Q.   Okay.
19      A.   I was crying, hysterical. Yes, I admit
20 to that.
21      Q.   Okay. Second -- there are four
22 different paragraphs. Second paragraph, "On the
23 way back, he received a phone call that his

**Michael Barakat**                                                                35

Page 137

1  business was on fire, he said.  The
2  air-conditioning fans and some tools were on, but
3  he has no idea what could have started the fire."
4      A.   Hearsay.
5      Q.   Okay.  You didn't tell anybody that?
6      A.   No.
7      Q.   Okay.
8      A.   But that sounds like somebody that was
9  working in there.
10     Q.   All right.  It looks like one of the
11  firemen -- yeah, "Chief Beckham said the fire
12  appeared to have been heaviest in the back work
13  area of the single story building, not the front
14  showroom.  Firefighters were still working to get
15  inside the building about 7:00 p.m. using heavy
16  saws to cut their way into the front entrance.  No
17  one was injured in the fire."  That's all true,
18  isn't it?
19     A.   No one was injured is true.
20     Q.   Okay.  "The owner of the business said
21  he's been there 12 years and never had an insurance
22  claim.  The business does numerous kinds of custom
23  auto work, including window tinting, remote

Page 138

1  starting equipment, navigation tools and custom
2  wheels."  Well, first of all, you haven't been
3  there 12 years, right?
4      A.   No.
5      Q.   Okay.  And notwithstanding you haven't
6  talked to the media or anybody about it?
7      A.   (Witness shakes head.)
8      Q.   So that could not be attributed to you?
9      A.   (Witness shakes head.)  At all, no.
10     Q.   Okay.  All righty.  And this article
11  I've been referring to I'll mark as Exhibit
12  Number 10.
13          (Whereupon, Exhibit 10 was marked
14          for identification.)
15     Q.   Okay.  I did a little snooping around,
16  too, to see if I could figure out what this old car
17  was.
18     A.   I see it.
19          (Whereupon, Exhibit 11 was marked
20          for identification.)
21     Q.   And I've marked as it as Exhibit 11.
22  Does that look like anything like what you had?
23     A.   That's it.

Page 139

1      Q.   Okay.
2      A.   You don't see them on the road no more.
3  You know how many times that stopped traffic on
4  First Avenue?  You want to sell it, you want to
5  sell it.
6      Q.   So did you drive it around?
7      A.   Yes.
8      Q.   Okay.  And --
9      A.   Parades.
10     Q.   But not just to go down to the Harbor
11  Freight and buy something?
12     A.   Putt, putt, putt, no.
13     Q.   Okay.  So any time you've had it out on
14  the road, it was some sort of an event?
15     A.   Yes.
16     Q.   Okay.  I mean, like a parade or
17  something and not just --
18     A.   It will stop traffic.  Everybody would
19  want to look, what is it, you know, when was it
20  made.
21          MR. LAWRENCE:  Answer the questions.
22     Q.   What color was yours?
23     A.   Black.

Page 140

1      Q.   All right.  This one has blue --
2  appears to be blue -- I can't say interior because
3  it doesn't have an interior, but seat covers.  Was
4  yours blue?  What color was it?
5      A.   Red.
6      Q.   Red, okay.  And the gentleman who
7  re-did it, did he change the coloring of the seats?
8  Did you ask him what all he did to it --
9      A.   No.
10     Q.   -- in that 30,000 hours of work they
11  did?
12     A.   No.
13     Q.   Okay.  But other than the different
14  color seats, yours looked like the one in
15  Exhibit 11?
16     A.   Not quite.  Spokes were wood.
17     Q.   Okay.
18     A.   And it had a full canopy and a trunk.
19     Q.   Did you ever see another one anywhere?
20     A.   Barrett Jackson, seven years ago, Las
21  Vegas.
22     Q.   Okay.  Now, what is Barrett Jackson?
23     A.   Auction.

**Michael Barakat**                                                   36

Page 141

1    Q.   And where in Vegas was it?
2    A.   At the MGM.
3    Q.   And the one that they had, was it for
4 sale or just to show?
5    A.   Auction.
6    Q.   Did anybody buy it?
7    A.   They wouldn't sell it.
8    Q.   So they didn't reach the reserve?
9    A.   Well, they reached 175,000, but he
10 wouldn't let it go.
11   Q.   I thought it was interesting that
12 apparently you told somebody that Jay Leno had
13 tried to buy yours?
14   A.   American Pickers has been by,
15 communicating with them.  I had oil sheets from
16 Saudi.  I listed it on eBay just to see what it
17 would bring, but I had no intentions of ever
18 selling my car.
19   Q.   When did you list it on eBay?
20   A.   A while back, '07, '09 when I first got
21 it to see what it was worth.
22   Q.   Did anyone make you a firm offer?
23   A.   No.  Firm offer is cash in hand.

Page 142

1    Q.   Well, did anyone make you an offer?
2    A.   Yeah.
3    Q.   Definite offer?
4    A.   (Witness nods head.)
5    Q.   And how much did they offer you?
6    A.   169.
7    Q.   Was it insured?
8    A.   The car?
9    Q.   Right.
10   A.   No.
11   Q.   Why in the world would you not insure
12 something that valuable?
13   A.   Why would anybody hurt my car?
14   Q.   Is there some reason --
15   A.   It's a conversation piece, show piece.
16 I'm never going to be on the interstate with it.
17   Q.   So you never thought about insuring it?
18   A.   Not really.
19   Q.   Okay.  So 511 Five Acre Road, Pleasant
20 Grove, Alabama, is that somewhere you lived
21 previously?
22   A.   511 Five Acre Road, this is most recent
23 acquired piece of property.

Page 143

1    Q.   Okay.  And did you buy it from Mekdad
2 Investments also?
3    A.   No.
4    Q.   This is kind of confusing.  This must
5 be -- which I thought initially was the ownership
6 history on the loss location, but it has your
7 address as the Five Acre Road, Pleasant Grove,
8 Alabama.
9         (Whereupon, Exhibit 12 was marked
10        for identification.)
11   Q.   I've marked this as Exhibit 12.  This
12 is Jefferson County, Alabama records, citizen
13 access.
14   A.   (Examining document.) I couldn't tell
15 you.  Just check with the County.  County errors.
16   Q.   Okay.  But that's a rental property and
17 not where you live?
18   A.   On the Five Acre Road?
19   Q.   Right.
20   A.   I don't live there, but it's not a
21 rental property.  My son stays there.
22   Q.   Oh, okay.
23   A.   So he's part of my family.

Page 144

1    Q.   Yeah.
2    A.   It's like homestead, second home to me.
3    Q.   Okay.  Is this the house and the barn
4 and all you told me --
5    A.   Yes.
6    Q.   -- you just bought?
7    A.   Yeah.
8    Q.   And your 20-year-old son is living
9 there?
10   A.   Yeah.  I just told him to move in there
11 if he wants.
12   Q.   Okay.  Now, going back to your
13 accountant, Ms. Harbison, how long has she been
14 your accountant?
15   A.   About a year and a half.
16   Q.   Would she have done your 2013 income
17 tax return?
18   A.   Yeah.
19   Q.   Okay.  What about 2012?
20   A.   That would be Springville Accounting.
21   Q.   Springville?
22   A.   Accounting, William Butch.
23   Q.   William who?

**Michael Barakat**                                                           **37**

Page 145

1    A.   Isley.

2    Q.   Isley.  And is he in Springville,

3  Alabama?

4    A.   He's the mayor.

5    Q.   He's the mayor of Springville, okay.

6    A.   And the accountant.

7    Q.   Mayor slash accountant.  And is there

8  some reason why you decided to go from the mayor of

9  Springville to do your accounting to Ms. Harbison?

10   A.   Yes.

11   Q.   What?

12   A.   What what?

13   Q.   Why did you change from Mr. Isley to

14  Ms. Harbison?

15   A.   We have to pay taxes by the 18th.

16   Q.   Sales tax?

17   A.   Yes.  I'm coming from Puerta Vallarta.

18  On the 16th, she calls, she says I came by the

19  store, you're not there.  I said but the paperwork

20  is ready and the check is ready in an envelope, all

21  you have to do is pick it up.  17th rolls around,

22  nobody comes to pick up the taxes.  I pick up the

23  phone.  I get attitude.  This is somebody --

Page 146

1    Q.   From the mayor?

2    A.   Yeah, from the mayor.  I'm paying you

3  to do my accounts.  We're not going to come down

4  there again, if you bring it, you're going to have

5  to bring it yourself.  That's a 45-minute ride and

6  I have a business to run.  I say well, just don't

7  worry about it, I will get another accountant to

8  handle my business.

9    Q.   All right.  So how long did Mr. Isley

10  do your taxes and your sales tax?

11   A.   Ten years.

12   Q.   Okay.  Now, is there some reason when

13  you obtained the EMC policy and purchased the

14  current location that Mekdad Investments was not

15  listed on the policy as the lienholder?

16   A.   Not that I know of.

17   Q.   Okay.  Did you ask the company to put

18  him on -- them on as a lienholder?

19   A.   Ask what company?

20   Q.   EMC.

21   A.   To put him as a lien -- no.

22   Q.   Okay.  And why are you personally

23  listed as an additional insured?

Page 147

1    A.   I don't understand.

2    Q.   Okay.  205 Customs is the named

3  insured.

4    A.   The company, LLC.

5    Q.   The company.  And then you, Michael

6  Barakat, is listed as an additional insured, which

7  covers you primarily for liability issues as the

8  store manager.

9    A.   Not the real estate owner?

10   Q.   No.

11   A.   Oh, that's something I wouldn't

12  understand if the insurance agent has filled out.

13  I would have no idea why.

14   Q.   Okay.  But you personally owned the

15  land and the property?

16   A.   Correct.

17   Q.   Okay.  And not 205 Customs?

18   A.   Yes, I did, owned it all.

19   Q.   Okay.  But you personally, not the

20  corporation owned the building?

21   A.   Explain, please.

22   Q.   Okay.  I'm asking you.  205 Customs,

23  that's your business?

Page 148

1    A.   Yes.

2    Q.   What you operate your business under.

3  But as far as the property itself, that's something

4  that you, Michael Barakat, owns?

5    A.   Yes.

6    Q.   Okay.  Now, when you bought this

7  property from Mekdad Investments, you said you put

8  $50,000 down.  Did you sell something to get that

9  amount of cash or did you go --

10   A.   No.

11   Q.   -- to a particular account and draw it

12  out?  Tell me where you got the $50,000 down

13  payment.

14   A.   Savings.

15   Q.   Savings, okay.  And would that be an

16  account at some bank?

17   A.   No.

18   Q.   All right.  In a sock in the barn?

19   A.   Yes.

20   Q.   Something you keep at home then?

21   A.   I've never thought about that, sock in

22  a barn.

23   Q.   I wouldn't recommend it.

**Michael Barakat**                                                             **38**

Page 149

1      A.   But try getting under the dog house.

2      Q.   The Pit Bull dog house?

3      A.   German Shepard.

4      Q.   German Shepard dog house, just as bad.

5   Okay.  Well, we've been over this stuff about the

6   proof of loss several times, but, you know, you

7   were provided proof of loss forms early in the

8   claim and then you submitted a claim, but it had no

9   numbers on it, so the company rejected it, correct?

10     A.   I don't know.  I've never heard.

11     Q.   Okay.

12     A.   Did they reject it?  Are you aware?

13  Where does it say rejected on it?

14     Q.   Okay.

15          (Whereupon, Exhibit 13 was marked

16          for identification.)

17     Q.   Exhibit 13, a letter to you in care of

18  your attorney September 16th.  Have you seen the

19  rejection letter?

20     A.   I haven't even heard about that.

21          MR. LAWRENCE:  This states the proof of

22  loss needs to provide a dollar amount.

23     A.   Okay.

Page 150

1      Q.   And I think Morgan sent forms to Kirby,

2   I sent forms to Kirby and so now maybe we're going

3   to get it done today.

4      A.   I'm the odd man out.  I have not

5   received or heard anything.

6      Q.   Okay.  We'll have to fuss at him about

7   that.

8      A.   You can't fuss at Kirby.  That's my

9   buddy.

10     Q.   But anyway, today we're going to fix

11  that.  You're going to put your numbers on the

12  blank?

13          MR. LAWRENCE:  Yeah.

14     Q.   Okay.

15          (Whereupon, Exhibit 14 was marked

16          for identification.)

17     Q.   And this letter went directly to you,

18  so I'm assuming you got this one, the reservation

19  of rights?

20     A.   Correct, got it.

21     Q.   You're aware it's being investigated

22  under reservation of rights?

23     A.   (Examining document.)  Got it.

Page 151

1      Q.   Okay.  Now, has anybody told you what

2   caused the fire?

3      A.   No.

4      Q.   Now, I understand that Mr. Farris

5   retained a gentleman named Jim Munger to go out and

6   look at the fire?

7      A.   Correct.

8      Q.   Have you spoken with him?

9      A.   No.

10     Q.   Do you have any idea what his

11  conclusions were when he went out there?

12     A.   No.

13     Q.   Do you know of any witnesses who may

14  have seen anything on the day of the fire?

15     A.   No.

16     Q.   Other than the videotape over at I Hang

17  TVs, do you know of any other videotapes or

18  photographs that anybody may have taken?

19     A.   Positively.  24-hour surveillance on

20  nine cameras inside the shop at 205 Customs running

21  seven days a week.

22     Q.   Okay.  And who has those?

23     A.   You, EMC.

Page 152

1      Q.   Are you talking about what was taken

2   out of the computers?

3      A.   Correct.

4      Q.   Okay.  Well, those have been

5   confiscated by Birmingham Police Department.

6      A.   Okay.  I didn't know who had them.

7      Q.   Okay.  Have you reviewed anything from

8   the computers?

9      A.   No.  I couldn't get to them.  But I'm

10  sure whoever has reviewed them knows I had nothing

11  to do with the loss.

12     Q.   Okay.  Tell me on this diagram here

13  where -- where were your cameras?

14     A.   Okay.  This is back door (indicating).

15     Q.   Okay.  Let's figure out something to

16  designate a camera.  How about a triangle like this

17  filled in?

18     A.   Triangle, okay.  Inside triangle

19  looking right there (indicating).

20     Q.   Okay.  Now, the point of the triangle

21  is where the camera was pointing, right?

22     A.   Yes.  Triangle right here (indicating).

23  Triangle right there (indicating).  Storage room

**Michael Barakat**                                                    **39**

Page 153

1  triangle right here (indicating).  Triangle right
2  there (indicating).
3      Q.   You've got two in that storage room?
4      A.   Yes, that's the high dollar storage
5  room.
6      Q.   Okay.
7      A.   I have it -- I have a metal cage --
8  metal bar cage built inside the room with a lock on
9  it because those are small boxes that cost me 2,000
10 to $3,000, high-end electronics.
11     Q.   Okay.
12     A.   Okay.  I have a camera by the equipment
13 shooting this way (indicating), shooting this way
14 (indicating), one shooting this way (indicating).
15 I had one right here in the bay shooting this way
16 (indicating).  I had one in the showroom this way
17 (indicating).  One in the showroom this way
18 (indicating).  I had one in the office this way
19 (indicating).  There's a light pole outside the
20 shop that has a camera shooting on it (indicating).
21     Q.   Pointing toward the front door?
22     A.   Yeah.  This is the front door
23 (indicating).

Page 154

1      Q.   Okay.
2      A.   This is First Avenue North
3  (indicating).  There's a light pole.  We got a
4  camera shooting right at this door (indicating).
5  And this is the outskirts of the store right here
6  (indicating).  We have a camera that spots the
7  whole parking lot this way (indicating) and one
8  that spots the whole parking lot this way
9  (indicating).
10     Q.   Okay.  All right.  And all those were
11 controlled by your computer?
12     A.   Correct.
13     Q.   Inside?
14     A.   Correct.
15     Q.   Okay.  All right.  And where you drew
16 the point, that's where the camera is pointing
17 toward, right?
18     A.   Correct.
19     Q.   Okay.
20     A.   That's outside shooting the parking lot
21 (indicating).
22     Q.   Okay.  Does anybody at your
23 surveillance company also monitor these cameras?

Page 155

1      A.   No, but I'm able to monitor them -- if
2  we were in Indonesia, we could monitor the store or
3  overseas, I could monitor the store.  Anywhere in
4  the earth.  There's a static IP and a web address.
5  I just log on my smart phone and I can watch any
6  cameras in the shop.
7      Q.   Is that live, though?
8      A.   Yes.
9      Q.   Okay.  Like if you wanted to go on your
10 camera phone or whatever and go back to the date of
11 loss, could you do that?
12     A.   (Witness shakes head.)
13     Q.   Or it's just live, is what you're
14 getting at?
15     A.   It's just live.
16     Q.   Okay.  All right.  Now, which one is
17 this one (indicating)?  Where is this one pointing
18 (indicating)?
19     A.   Let me see that.  One outside, one
20 outside, one right here, facing cars going in and
21 one out here facing cars in this area (indicating).
22     Q.   Okay.  Let's make this a little more
23 pointy on this end then.  Okay.  Where is this one

Page 156

1  pointing (indicating)?
2      A.   Showroom inside.
3      Q.   This one is pointing this way
4  (indicating)?
5      A.   This one is pointing this way
6  (indicating).
7      Q.   Okay.
8      A.   And there's one in this stock room
9  pointing this way (indicating) and there's one
10 pointing this way (indicating).
11     Q.   Is this one here (indicating)?
12     A.   That's my office, yes, there's one
13 right there.
14     Q.   One, two, three, four, five, six,
15 seven, eight, nine, ten, eleven, twelve, thirteen?
16     A.   There will be twelve of them.
17     Q.   You've got an extra somewhere then.
18     A.   Let's see.  One of -- these -- one of
19 these is here (indicating), the other one is not.
20 This is inside (indicating).  This is in the bay
21 (indicating).  This is in the bay (indicating).
22 This is up here (indicating).  This is outside
23 (indicating).  This is on the light pole

**Michael Barakat**                                                     **40**

---

Page 157

1  (indicating).  Got one over here (indicating), one
2  showing the cash register (indicating), one in the
3  office (indicating), one in the storage right here
4  (indicating).  And that's it.
5      Q.   Okay.  This one is out of place then
6  maybe (indicating)?
7      A.   There's not one there.
8      Q.   Okay.  So according to these aerial
9  photographs, it looks like that roof is still in
10  place over the entryway.  Has it fallen in since
11  then?
12      A.   Don't know.
13      Q.   When you said that it had fallen down
14  and you wouldn't be able to access the picture --
15      A.   A lot of debris is on the ground.
16      Q.   Okay.  So maybe like -- did you have
17  like some sort of -- what am I trying to say?
18  Acoustical tile or something --
19      A.   Yes.
20      Q.   -- between that and the roof?
21      A.   Yes, and there's metal on top and wood
22  on top of it.
23      Q.   Okay.  So some of that stuff has fallen

---

Page 158

1  down?
2      A.   (Witness nods head.)
3      Q.   Okay.  All righty.  When you went over
4  to I Hang TVs to look at the video, did anybody go
5  with you?
6      A.   No.
7      Q.   That same day you were sitting in the
8  car outside in a red vehicle with somebody for a
9  long time.  Do you know who that was?
10      A.   Red --
11      Q.   Yes.
12      A.   -- vehicle?
13      Q.   Yes.
14      A.   If it's a red vehicle, it would be my
15  wife.
16      Q.   Okay.  And what red vehicle does she
17  drive?
18      A.   I don't know.  I mean, you say it's a
19  red vehicle and I'm in it.  I'd have to see me in
20  it to recognize the vehicle.
21      Q.   Okay.  It was reported that you were
22  sitting out there for a long time observing the
23  surveillance cameras on the business across the

---

Page 159

1  street in a red car with someone who looked a lot
2  like you that was driving.
3      A.   Then it's not me.
4      Q.   Then it wasn't you, okay.  All right.
5  Okay.  The trip to Dubai in December of 2013, would
6  that have been you?
7      A.   Yeah.
8      Q.   And right before the fire, were you in
9  Florida?
10      A.   Yes.
11      Q.   Like August -- I was --
12      A.   Michigan.  Michigan a week before,
13  Florida the week before that.
14      Q.   Okay.  So whoever was using your debit
15  card or charge card was you, right?
16      A.   Yes.
17      Q.   Is anybody authorized to sign checks on
18  your business account except for you?
19      A.   No.
20      Q.   So when you said earlier that Ms.
21  Harbison would give you a check, what you meant was
22  she would just tell you what you were going to --
23  the amount to write the check for?

---

Page 160

1      A.   She'll say a total.  I sign the check.
2      Q.   But she actually makes the check out?
3      A.   (Witness nods head.)
4      Q.   Does she keep your checks?  Does she
5  have some of your checks?
6      A.   Yes.
7      Q.   And she writes them out and you just
8  sign it?
9      A.   Yes.
10      Q.   Oh, okay.  So she does have your
11  checkbook?
12      A.   No.  I have my checkbook.  She'll come
13  into my office.  She say this is the total for this
14  month, including my fees.  I'll sign the check and
15  give it to her blank and tell her to fill it out.
16      Q.   Okay.  And the company that monitors
17  your alarm is IET?
18      A.   Correct.
19      Q.   And since you've moved in that -- since
20  you've been in that building, have they been the
21  only surveillance and security --
22      A.   They're the ones that installed and
23  secured and monitor.

---

Michael Barakat                                                          41

Page 161

1    Q.   Okay.  AVR Distributing, what kind of
2  things do they sell to you?
3    A.   Audio Video Representatives, everything
4  electronic.
5    Q.   What's your practice with regard to
6  that kind of thing?  Do you keep a certain amount
7  of inventory on hand or do you buy it as needed?
8    A.   Inventory on hand.
9    Q.   Can you kind of anticipate what kind of
10  business you're going to be having in a month?
11    A.   No.
12    Q.   If you buy -- I saw where there were a
13  lot of -- all this stuff is,
14  Kenwood stuff, I'm assuming those are speakers and
15  stereos and all?
16    A.   It's the hottest brand.
17    Q.   Say you order ten of them and after two
18  months go by and you haven't sold any of them, can
19  you return them?
20    A.   I don't want to.
21    Q.   Okay.  You don't want to.  You just
22  want to keep --
23    A.   I'll wait for a better deal and buy

Page 162

1  some more.  I'll buy ten more because eventually,
2  they'll sell.
3    Q.   Okay.  We talked about Angel
4  Distributing earlier.  What kind of things do you
5  get from them?
6    A.   Everything.
7    Q.   Well, what's everything?
8    A.   Tint, alarms.
9    Q.   Okay.  You're saying tint, like
10  T-I-N-T?
11    A.   Correct.
12    Q.   To darken the windows, correct?
13    A.   Rolls of tint, film.
14    Q.   Okay.  And what else did you say?
15    A.   Alarms.
16    Q.   Alarms?
17    A.   Remote starts, car stereos, speakers,
18  amplifiers, accessories, peripherals, install
19  screws and drivers.
20    Q.   Now, as far as Angel is concerned, do
21  you have a representative that comes around with
22  stuff on a truck and you get it then?
23    A.   I deal with the owner.

Page 163

1    Q.   What I'm trying to ask you is:  How do
2  you get the materials?  Do you order it or --
3    A.   Owner delivers.
4    Q.   Do you order it and then the truck
5  comes and delivers it some time later?
6    A.   And sometimes I go pick it up.
7    Q.   Okay.  And where is the Angel location?
8    A.   Angel location was in Pelham up until
9  about a year ago.  They are now off of Green
10  Springs where the old Rickwood Radio used to be.
11    Q.   Okay.  Now, what about AVR, is that a
12  local business?
13    A.   Atlanta.
14    Q.   Do they have a delivery truck or is it,
15  again, like --
16    A.   Seldom.  We'd have to go get our stuff
17  or get it shipped.
18    Q.   All right.  What about Seytec,
19  S-E-Y-T-E-C?
20    A.   Seytec, California.
21    Q.   And what kind of things do you get from
22  them?
23    A.   Alarms, tint, tint supplies.

Page 164

1    Q.   Same things, huh?
2    A.   Bypasses, lots of electronic gadgets.
3    Q.   So what kind of gizmos do you have on
4  your own car?
5    A.   What do you want?
6    Q.   Well, I mean, what do you have?  Do you
7  have after-market stereo and all kinds of things?
8    A.   Turn car on.  What would you like to
9  listen to?
10    Q.   Well, you better not turn it on
11  wherever it is.
12    A.   It's in the parking deck and it will
13  turn on on voice command.
14    Q.   Wow.  Okay.  What is your current home
15  address?
16    A.   1518 Covered Bridge Road, Cleveland.
17    Q.   Cleveland?
18    A.   Alabama, 35049.
19    Q.   Okay.  And you've been there how many
20  years?
21    A.   About -- since '08, '07.
22    Q.   Okay.  And your address just previous
23  to that was where?

Page 165

1    A.   7824 Second Avenue South, 35206.

2    Q.   That's where you lived?

3    A.   Yes.

4    Q.   Okay.  Did you own that home or rent

5  it?

6    A.   Owned it.

7    Q.   Do you still own it?

8    A.   No.  Donated it.

9    Q.   Oh, that's right.  Okay.  That's where

10  the fire happened.  Were you living there when the

11  fire happened?

12    A.   No.  We had moved out of it two years

13  and a lady was leasing it.

14    Q.   Okay.  I think I already covered this

15  with you.  You don't have any business partners --

16    A.   No.

17    Q.   -- currently or when the fire happened?

18  So what was Matthew Gilpin's reaction when he found

19  out that his car had burned up?

20    A.   You're going to pay for my fucking car.

21    Q.   So did he -- did you tell him about it

22  or did he find out from some other source?

23    A.   I called him.

Page 166

1    Q.   Do you happen to have his phone number?

2    A.   Yes, I do.

3    Q.   Okay.  What's Matt's phone number?

4    A.   (Looking in cell phone.) 999-7279.

5    Q.   And is that 205 exchange?

6    A.   Correct.

7    Q.   Okay.  Now, when he brought his car in,

8  did he pay you any money on what you were going to

9  do for him?

10    A.   I had to take a deposit down because of

11  the amount of work that was going to go in it.

12    Q.   How much did he pay you?

13    A.   500.

14    Q.   Okay.  And what did you do with that

15  500?

16    A.   Back pocket.

17    Q.   Now, I noticed on your bank records

18  that you made a $4,000 deposit either that day or

19  the next.  Where would that 4,000 have come from?

20    A.   I have no idea what you're talking

21  about.

22    Q.   Okay.  I knew you were going to make me

23  find it.

Page 167

1    A.   Uh-huh.

2        MS. STUBBS:  While you're looking at

3  that, can we take a short break?

4        MS. WILLIAMSON:  Absolutely.

5        (Brief recess.)

6    Q.   (BY MS. WILLIAMSON:)  Now, since the

7  fire has happened, have you received any advances

8  from EMC?

9    A.   No.

10    Q.   Were you offered advances?

11    A.   Yes.

12    Q.   Okay.  And I think at some point you

13  were discussing perhaps opening a business

14  somewhere else temporarily?

15    A.   The adjustor recommended that I find me

16  another location and open up in it.

17    Q.   Okay.  And did you explore that option?

18    A.   Didn't entertain it at all.

19    Q.   Okay.  And why is that?

20    A.   I own the property.  That's my shop.

21  People come to it because they know it and they

22  know the work.  Location-driven business.

23    Q.   Did you tell me that you knew or you

Page 168

1  didn't know whether or not Trey had disconnected

2  the battery on Mr. Gilpin's car?

3    A.   I told him, but I don't know if he did

4  or did not.

5    Q.   Okay.

6    A.   There's two batteries, mind you, in the

7  car.

8    Q.   Okay.  And so do you know whether he

9  addressed both of those?

10    A.   No.

11    Q.   Okay.  Did you have a conversation with

12  him about it?

13    A.   Yes.

14    Q.   What did he tell you?

15    A.   He disconnected the front one.

16    Q.   Okay.  But not the other one?

17    A.   No.

18    Q.   Okay.  Tell me again where the other

19  one that you saw was installed improperly was

20  located.

21    A.   Cargo compartment.

22    Q.   What kind of compartment?

23    A.   The cargo compartment in the back of

**Michael Barakat**                                                          **43**

Page 169

1  the Expedition.

2      Q.   Okay.

3      A.   Basically the trunk.  Freestanding

4  battery -- high-powered battery, power wire running

5  to it from under the hood and then it's powering up

6  the amplifiers that power up the subwoofer system.

7      Q.   Okay.  And it's just sitting there in

8  the cargo area?

9      A.   Yeah, naked wires, and then the wires

10  go to a distribution block, which is supposed to be

11  covered.  So you got positive and negative on it

12  and there's no cover whatsoever on it.

13      Q.   Okay.  Now, when you say the wires are

14  raw, does that mean no insulation on them?

15      A.   No insulation on the end of them.

16      Q.   On the end?

17      A.   Uh-huh, where they connect.

18      Q.   Where is the distribution block

19  located?

20      A.   Right behind the last row seat.

21      Q.   Now, does this vehicle have three rows

22  of seats?

23      A.   Yes.

Page 170

1      Q.   So this would be actually also in the

2  cargo compartment but next to the last seat?

3      A.   Correct.

4      Q.   Okay.  When you looked in the car, did

5  you see anything in there, like any of Mr. Gilpin's

6  possessions back there?

7      A.   Yeah.  There's a -- there was a

8  suitcase and a laptop and a CPU case.

9      Q.   A what?

10      A.   CPU case, computer tower.

11      Q.   And did y'all remove anything from his

12  vehicle to do the work?

13      A.   No.

14      Q.   Other than disconnecting the battery,

15  did anybody do anything else to the car to get

16  ready to do the job?

17      A.   Yeah.

18      Q.   What else?

19      A.   Took the door panels off and proceeded

20  to put brand new speakers in it, replace the

21  speakers.

22      Q.   Okay.  Now, you hadn't replaced the

23  speakers yet, had you?

Page 171

1      A.   No.

2      Q.   Because what I'm asking is:  What had

3  you physically done to start the job?

4      A.   Take the door panels out and take the

5  old speakers out.

6      Q.   Okay.  And I'm still just a little bit

7  confused about when you took those pictures.  Was

8  that before or after Trey and BJ left?

9      A.   Those pictures were taken as soon as

10  the truck pulled up.

11      Q.   Okay.  While Mr. Gilpin was still

12  there?

13      A.   Yes.

14      Q.   Okay.  I think you did say that

15  earlier.  When you first heard about the fire, did

16  you use your mobile device to try to look at --

17  look at the inside of the building or anything at

18  that point?

19      A.   What do you mean?

20      Q.   Well, you were telling me that you

21  could access those cameras that are in your store

22  any time, you know, live feed.  So when you first

23  heard about the fire, did you try to do that?

Page 172

1      A.   No.

2      Q.   Okay.  So did you try to do it at any

3  point?  I mean, I'm sure at some point they turned

4  the power off, but --

5      A.   No.

6      Q.   If there was a power failure, would

7  that system still work?

8      A.   The alarm would, not the cameras.

9      Q.   Okay.  Because that's got a battery

10  backup on it?

11      A.   Battery and cell backup.

12      Q.   When there's something that happens in

13  the store like that, do you get an alert on your

14  phone?

15      A.   No.  I get a phone call.

16      Q.   Did you get a phone call from the

17  security at any point?

18      A.   No.

19      Q.   Well, I think I'm right about -- I've

20  read a lot of material, but I think I'm right.  The

21  alarm company said that you did not have any kind

22  of fire protection, you know, notification or alarm

23  when there was a fire.  But you told me earlier

**Michael Barakat**                                                                 44

1  that it was your understanding that you did?

2      A.  Yeah.

3      Q.  Okay.  But on this instance, you did

4  not get a phone call from your security system?

5      A.  No.

6      Q.  Okay.  Are you related to Caldoon

7  Barakat?

8      A.  Yes.

9      Q.  And how are you related to him?

10      A.  My brother.

11      Q.  Oh, he's your brother?

12      A.  (Witness nods head.)

13      Q.  And he's no longer still in Alabama?

14      A.  He's in Houston.

15      Q.  I think before we took a break I had

16  asked you about a $4,000 deposit that was made on

17  August 25th, two days after the loss, and you had

18  said that you were missing $4,000.  I was just

19  wondering if that might be -- did you deposit it

20  into your account by any chance?

21      A.  (Examining document.)  I was missing

22  $5,000.

23      Q.  Well, actually, you said 64, but --

1      A.  5,000 was in the military box, 1,000

2  was in the drawer and the rest was in the cash

3  register.

4      Q.  Cash register?

5      A.  Yes.

6      Q.  Okay.

7      A.  Five plus one plus four.

8      Q.  All right.  When is the last time you

9  actually saw the money you say was in the cash

10  register?

11      A.  After the fire was put out and we were

12  allowed access in the shop and I walked over to see

13  where the register is inside of a cabinet on the

14  floor.  The register was tipped over to its nose

15  and the cash drawer was out of it and you can see

16  about this much (indicating) of what the contents

17  are.

18      Q.  Okay.  Did you remove anything from it

19  at that point?

20      A.  No.

21      Q.  Okay.  And the money that you had in

22  the drawer to pay the guys, you last saw it right

23  when you left --

1      A.  Correct.

2      Q.  -- to go to Harbor Freight?

3      A.  Correct.

4      Q.  Okay.  When you went back in there to

5  look after the fire, did you say you were with the

6  fireman?

7      A.  With the fireman.  The fireman was the

8  one that looked.

9      Q.  Did y'all open those two drawers and

10  look for the money at that point?

11      A.  They did.  We couldn't get back there.

12      Q.  Okay.  And they reported to you there

13  was nothing there?

14      A.  There was nothing there.  They brought

15  me two checkbooks.  One of them was missing a whole

16  page.  That's when I went down to PNC and the 4,000

17  branch deposit on 8/25 might have been a payment

18  I'm making to Angel's.

19      Q.  So is that what you do sometimes when

20  you owe a bill, you'll take down money and put in

21  your account --

22      A.  Yeah.

23      Q.  -- to pay it?  Okay.  Yeah, the next --

1  let's see.  August 27th, there is a withdrawal of

2  $3,800 for something, it says debit for Bank of

3  America online payment.  Do you know what that

4  would be?

5      A.  Bank of America -- that's a credit card

6  payment.

7      Q.  That's your credit card payment, okay.

8  So that must have been what you did.

9      A.  Probably.

10      Q.  Initially there was some discussion

11  about the stereo equipment.  Did you accuse the

12  firefighters of getting it at some point?

13      A.  I didn't accuse the firefighters.

14      Q.  Okay.  Well, there was some stereo

15  equipment that was taken out of the store the night

16  of the fire, right?

17      A.  Correct.

18      Q.  Okay.  And what happened to it?

19      A.  The help went in there as they heard

20  the fire department public service saying this

21  equipment is some good, meaning that it's still

22  good, even though all the equipment that was

23  displayed on the wall had disappeared.  So the help

Page 177

1 started taking the front two showcases, which were
2 waterlogged and smoke-damaged boxes of equipment
3 and threw them in the back of the white van.
4     Q.   You're talking about Trey and BJ?
5     A.   BJ.
6     Q.   Okay.  And they took them out of the
7 boxes and put them in your van, right?
8     A.   Took them out of the showcases and put
9 them in the back of the van, yes.
10     Q.   Didn't they throw the boxes there in
11 front of the store?
12     A.   They were waterlogged, so the equipment
13 was falling out of it.
14     Q.   Yeah.  So they put the stuff in your
15 van?
16     A.   Uh-huh.
17     Q.   Okay.  And where did you take it?
18     A.   I have it in my basement in a
19 Tupperware.
20     Q.   In Tupperware?
21     A.   I mean, it's full of water and the
22 boxes are, you know, smoke damaged, you know, just
23 charred.

Page 178

1     Q.   Right.  Did you take anything out of
2 the store prior to the fire that same day?
3     A.   No.
4     Q.   Did any of your helpers take anything
5 out of the store that day?
6     A.   No.
7     Q.   Do you have any kind of off-premises
8 storage where you keep things for the business?
9     A.   No.
10     Q.   So other than those things you've got
11 in your basement at home that was recovered after
12 the fire, you don't have any other equipment
13 anywhere else?
14     A.   Correct.
15     Q.   Do you know who actually reported the
16 fire?
17     A.   No.
18     Q.   Now, where were you exactly when you
19 got the call and found out about the fire?
20     A.   First Avenue North on the way back
21 towards the shop.
22     Q.   Okay.
23     A.   Behind BJ and Trey.  They were in the

Page 179

1 car in front of me.
2     Q.   And you think your first call was from
3 Moe or was it from --
4     A.   The first call was from BJ in the car
5 in front of me and then several calls ensued.
6 Those calls were probably the lienholder, the
7 police officer, other peoples from the
8 neighborhood, you know.  I just don't remember
9 exactly who it was and when they called.  But we
10 have all the numbers.
11     Q.   I'm going to give you a copy of -- I
12 wrote down all these numbers and the ones that you
13 could not identify, would you see if you can?
14     A.   I will try.
15     Q.   Okay.  I think particularly this one on
16 here that you spoke with for 18 minutes that -- it
17 looks like you spoke with -- you call that number
18 at 9:04 and then whoever it was returned your call
19 and y'all spoke for 18 minutes at 9:22.  But I'm
20 particularly interested in the sequence of the
21 numbers right after the fire, who these people are.
22 So would you do that?
23     A.   What's the number?  I can call them

Page 180

1 right now.
2     Q.   Okay.  541-0356.
3     A.   (Looking in cell phone.)  That's Moe
4 Mekdad.
5     Q.   It's who?
6     A.   Moe Mekdad, the lienholder.
7     Q.   Okay.  All right.  How about 937-8935?
8     A.   Let's see if it rings a bell.  (Looking
9 in cell phone.)  937 --
10     Q.   8935.
11     A.   No, nothing there.
12     Q.   All right.  How about 902-3076?
13     A.   902-37 --
14     Q.   3076.
15     A.   (Looking in cell phone.)  Charlie.
16     Q.   All right.  Who is Charlie?
17     A.   Charlie Angel.
18     Q.   Charlie Angel?
19     A.   Angel Distributing.
20     Q.   Oh, okay.  And if you don't mind
21 putting this one in that had the longer call to
22 222-4812.
23     A.   (Looking in cell phone.)  48 --

**Michael Barakat**                                                          **46**

Page 181

1    Q.   12.

2    A.   12.  That's Omar Mekdad.

3    Q.   Again, okay.  Oh, no, that's the one

4  that --

5    A.   Said that he owned the building.

6    Q.   Right.  Okay.  Do you recall what y'all

7  talked about for 18 minutes later that night?

8    A.   Discussing the mortgage on the store

9  and what would happen.

10   Q.   So --

11   A.   And basically cussing him out really.

12   Q.   Because?

13   A.   Because he got on TV and he said that

14  he owned the store.

15   Q.   You already knew that that night?

16   A.   Somebody came and told me.  My

17  son-in-law sent me a text with the whole thing off

18  of Fox 6 on my phone and he said somebody is

19  claiming your store and saying that it was theirs

20  for seven years.  And I looked at it and watched it

21  and I was like do you really love the limelight

22  that much.

23   Q.   So who is your son-in-law?

Page 182

1    A.   Emad.

2    Q.   Spell, please.

3    A.   E-M-A-D.

4    Q.   What's his last name?

5    A.   Mohamed, M-O-H-A-M-E-D.

6    Q.   All right.  And he's married to which

7  daughter?

8    A.   Meme.

9    Q.   Okay.  To your knowledge, was there

10  anything left turned on in that garage area where

11  the Expedition was?

12   A.   To my knowledge, yes.

13   Q.   Okay.  What?

14   A.   Central heat and air, the fans, the

15  compressors.

16   Q.   Okay.  Now, what kind of fans are you

17  speaking of?

18   A.   We have port-a-cool that hooks up to

19  the water and a power supply and sprays mist.  Then

20  there's three big circular fans that sit on the

21  ground and just move air.

22   Q.   Okay.  The port-a-cool and three

23  circular fans and did you say anything else?

Page 183

1    A.   The big ones that sit on the ground.

2    Q.   Yeah, I know.  Did you say anything

3  else?

4    A.   The air compressor, the computers, the

5  surveillance system, central heat and air.

6    Q.   Were those things in the bay area where

7  this vehicle was sitting?

8    A.   No, no, no.  Just the first items were

9  in the bay.  The electronics were in the front

10  showroom.

11   Q.   Okay.  Now, this port-a-cool, it was

12  unplugged?

13   A.   No.

14   Q.   You don't think so?

15   A.   I don't think so.

16   Q.   Okay.  So to your understanding, that

17  was still --

18   A.   Right.

19   Q.   That was on and in operation?

20   A.   Yes.

21   Q.   All right.  And what about the circular

22  fans?  Were any of those on and in operation when

23  you left --

Page 184

1    A.   At least one of them.

2    Q.   Okay.  And where would the port-a-cool

3  fan be located?  This X is the vehicle right here

4  (indicating), right?

5    A.   Okay.  Port-a-cool right here

6  (indicating).  Circulars would be right here

7  (indicating).

8    Q.   Okay.  All right.  Now, where would

9  this fan have been plugged in, the port-a-cool?

10  Where is the outlet it would have been plugged in?

11   A.   Extension cords.  I don't know.

12   Q.   Okay.  You don't know where --

13   A.   (Witness shakes head.)

14   Q.   All right.  Same thing for these fans

15  (indicating)?  Were they on extension cords, too?

16   A.   Extension cords, yeah.

17   Q.   All right.  And I have indicated on

18  Exhibit 3 -- or you and I together have put where

19  those were located, right?

20   A.   (Witness nods head.)

21   Q.   Now, the car, you told me earlier it

22  had a registration but that would have been to the

23  gentleman you purchased it from, correct?

Page 185

1    A.    I beg your pardon?

2    Q.    The antique car, it had a registration,

3  I think you told me, but that would have been in

4  the name of the gentleman that you bought it from?

5    A.    What do you mean registration?  Those

6  cars in 1902 didn't have titles or registrations.

7  He can only get a tag receipt.  I had a tag receipt

8  and a bill of sale and the tag.

9    Q.    Okay.  And the -- the tag receipt then

10 was in the gentleman's name that you bought it

11 from?

12   A.    Correct.

13   Q.    Because you never got a tag in your own

14 name?

15   A.    I never get anything swapped.  I was

16 just ecstatic to get the car.

17   Q.    Because you didn't drive it on the

18 street anyway, right?

19   A.    No.

20   Q.    And that tag receipt, would that have

21 been in Blount County?

22   A.    Correct.  That's how you can tell if

23 it's a replica.

Page 186

1    Q.    How is that?

2    A.    If it's got a title, it's a replica.

3  If it's just a tag receipt, you've got an original.

4    Q.    And who makes that determination?

5    A.    Google.  Google research, yeah.  I have

6  to find out what I have.

7    MR. LAWRENCE:  Just answer her

8  questions.  Okay?  And leave it at that.

9    Q.    So you're saying that if it's a kit car

10 as opposed to an original, you would have to have a

11 tag -- or you'd have to have it registered?

12   A.    Title and registration.

13   Q.    Now, when the fire happened, did you

14 have any suppliers that you owed money to?

15   A.    A couple.

16   Q.    Okay.  Who did you owe?

17   A.    Angel's and AVR.

18   Q.    And have those been paid now?

19   A.    Yes.

20   Q.    So you're all paid up with both -- with

21 all your suppliers?

22   A.    Yes.

23   Q.    Okay.  I saw one cancelled check to

Page 187

1  Roland Motors for $18,055 with the notation "cars".

2  What was that for?

3    A.    Bought used cars with my new wholesale

4  license.

5    Q.    Okay.  That was like October when you

6  started doing those, right?

7    A.    Yes.  Under Roland's license and paid

8  him with that.

9    Q.    One more time, please.

10   A.    Under Roland's license and paid him

11 with a check.

12   Q.    Okay.  When was it when you paid off

13 the mortgage?

14   A.    End of September.

15   Q.    Okay.  I think I asked you about this

16 before and I don't know if you answered me or not.

17 On August the 26th, you made a $27,314.20 deposit

18 into your account and then on August the 26th,

19 there was a debit of 32,314.20.  Do you know what

20 that was for?

21   A.    Yes.

22   Q.    What was that for?

23   A.    Purchase of a foreclosure property.

Page 188

1    Q.    That's right.  You did -- I asked you

2  that very same thing and you told me.  I'm sorry.

3  And you're sure that you've never had any other

4  fire other than the one that you told me about

5  earlier, the property that you donated?

6    A.    Positive.

7    Q.    Okay.  You haven't had another fire

8  claim with State Farm?

9    A.    No.

10   Q.    When you go out of town, like when you

11 were in the Middle East and to Vegas and Florida

12 and all that, who minds the store?

13   A.    The employees.

14   Q.    So you trust Trey and BJ to run the

15 store while you're gone?

16   A.    Yes.

17   Q.    And did you give them a key?

18   A.    My son has a key.  He'll open for them

19 and come back and close up.

20   Q.    Okay.  So does he -- does your son do

21 anything in the business?

22   A.    Other than keep a watch and eye.

23   Q.    Okay.  So he would just come down and

**Michael Barakat**                                                                48

Page 189

1  let them in in the morning and come back at night
2  and close up?
3      A.  Yes.
4      Q.  If there was money to be deposited in
5  the bank, who would do that?
6      A.  My son would collect it.
7      Q.  Okay.  So at the end of the day, he
8  would look over the -- what had been done and take
9  appropriate action?
10     A.  Yes.
11     Q.  All right.  What does he do for a
12 living?  Does he work anywhere?
13     A.  He goes to college and he is gainfully
14 employed by Freight Liner.
15     Q.  Freight Liner?
16     A.  Yes.
17     Q.  Like the trucks?
18     A.  Diesel tech.
19     Q.  Okay.  What about your son-in-law you
20 told me about earlier, does he do anything with
21 your business?
22     A.  He owns his own plumbing company.
23     Q.  But he doesn't do anything with your

Page 190

1  business?
2      A.  (Witness shakes head.)
3      Q.  Does anybody else other than your son
4  do anything for you?
5      A.  No.
6      Q.  Did you do anything at all to cause the
7  fire at your store?
8      A.  No.
9      Q.  Did you ask anybody to do it for you?
10     A.  No.
11     Q.  Do you remember if you had a job the
12 day of the fire that would have cost $173?
13     A.  I don't recall.
14     Q.  Because there was a receipt found in
15 the register for $173 and there was $56 in cash
16 found in the register.
17     A.  Who found the cash?
18     Q.  Will Smith when he took the debris off
19 of the table and found the cash.
20     A.  Okay.  So there was my cash in the
21 register.
22     Q.  $56 and it's in a plastic bag in an
23 evidence locker.

Page 191

1      A.  It was more than that.
2      Q.  Well, that's all that he found.
3      A.  Okay.
4      Q.  And the register -- and the receipt.
5  So if you had a receipt for a job, your copy, would
6  it still be in the book you're talking about?
7      A.  Copy in the book, credit card receipt
8  in the register.
9      Q.  Okay.  So that could have been a credit
10 card receipt.  Okay.  Now, you mentioned something
11 about -- to someone about having real estate checks
12 in a drawer?
13     A.  Yes.  There was a -- rental payment
14 coming in and a mortgage payment coming in that I
15 hadn't deposited and they were in my desk.
16     Q.  Okay.  Now, the rental payment, who
17 would that have been from?
18     A.  From -- I can't really pronounce his
19 name.  Center Point house.  I call him Lightfoot.
20     Q.  And how much was that?
21     A.  500.
22     Q.  All right.  What about the mortgage
23 payment, who was that from?

Page 192

1      A.  550 from Kristina Giles, the house in
2  north Birmingham.
3      Q.  Johns?
4      A.  G-I-L-E-S.
5      Q.  Giles, okay.  So did you call them and
6  they sent you another check?
7      A.  Yes.
8      Q.  Okay.  And where in your desk did you
9  have the rental checks?
10     A.  Middle.
11     Q.  Middle drawer, okay.  When Ms. Harbison
12 took over doing your taxes and things for you, did
13 you get any materials, any old taxes and that sort
14 of thing from Mr. Isley?
15     A.  We attempted to.
16     Q.  Okay.  But you didn't get anything?
17     A.  Got some.
18     Q.  Okay.  Do you know if he kept anything
19 or he just turned over to you what he had at the
20 time?
21     A.  He turned it over to her.
22     Q.  To Ms. Harbison, okay.  When you told
23 me earlier about your car incidents, you told me

**Freedom Court Reporting, Inc**                    877-373-3660

Page 193

1  about the 2006 Viper that you were in an accident
2  and it caught fire, right?
3      A.   (Witness nods head.)
4      Q.   (Indicating).
5      A.   Yes.
6      Q.   And you told me about a Corvette.  Did
7  you have an accident in the Corvette?
8      A.   (Witness nods head.)  Yes.
9      Q.   Okay.  Was it actually stolen and
10 recovered burned?
11     A.   The accident happened on University.  A
12 freshman T-boned the car, said she didn't see it.
13 So I left it there and called the tow truck to come
14 and collect it and take it to Edwards Chevy.  And a
15 tow truck shows up.  I was back at work and they
16 said they couldn't find the vehicle anywhere.
17     Q.   So that would have been June 25th,
18 2008?
19     A.   I don't remember accurately exactly
20 what date it was.
21     Q.   Okay.  And was it recovered burned?
22     A.   That, I don't -- I mean, I don't
23 recollect anything after reporting it.

Page 194

1      Q.   Okay.
2      A.   But it was paid for in cash and State
3  Farm sent a check.
4      Q.   The profit and loss statements, do you
5  know who prepared those?
6      A.   Sharon, the accountant.
7      Q.   Ms. Harbison, okay.  And as far as the
8  gross sales, do you know where she got the data --
9      A.   No.
10     Q.   -- that she put on the gross sales?
11 What about the cost of goods sold, do you know
12 where she --
13     A.   Invoices.
14     Q.   And the expenses?
15     A.   Checks wrote out, receipts, you know,
16 accounts payable.
17     Q.   Do you write a check for almost -- for
18 all of your expenses?
19     A.   No.
20     Q.   Okay.  What are some of the things you
21 pay cash for?
22     A.   Power bill, water bill, sometimes the
23 insurance, sometimes the suppliers.

Page 195

1      Q.   Okay.  Other than suppliers, who do you
2  have to pay on a regular basis for your business?
3      A.   Mortgage.
4      Q.   $1,000 mortgage.  Okay.  What else?
5      A.   Your water, power, cable, Internet,
6  monitoring -- security monitoring.
7      Q.   Wait, hold on.  Okay.  Water bill, how
8  much is that?
9      A.   No idea.
10     Q.   Are you the one that usually pays the
11 bills?
12     A.   Most of the time, yes.
13     Q.   Okay.  Generally speaking, are we
14 talking $100 for the water or less?
15     A.   On average.
16     Q.   About $100?
17     A.   Uh-huh.
18     Q.   All right.  What about your power bill?
19     A.   250, 300 on average.
20     Q.   Okay.  Now, you said your cable.
21 Brighthouse Cable?
22     A.   Brighthouse runs everything, phone,
23 Internet, cable, fax, phones, digital credit card

Page 196

1  machines.
2      Q.   All right.  And how much is that per
3  month?
4      A.   150.
5      Q.   Really?  For all that?
6      A.   (Witness nods head.)
7      Q.   That's pretty good.  Okay.  What about
8  your security?
9      A.   Security, I pay them with a check once
10 a year.
11     Q.   Once a year?
12     A.   Yeah.
13     Q.   So I saw --
14     A.   I write the whole check, send it to
15 them and I'm monitored.
16     Q.   Okay.  So how much is that?
17     A.   I don't recall.
18     Q.   I saw a check for 330, I think.  Would
19 that have been a whole year?
20     A.   For them?
21     Q.   Yeah.
22     A.   Yeah.
23     Q.   Okay.  What about gasoline?  How much

Page 197

1  do you spend for gasoline in a month?
2      A.   Gasoline for what?
3      Q.   Riding around, coming back and forth to
4  work?
5      A.   Oh, back and forth?
6      Q.   To get supplies and that sort of thing.
7      A.   Let's see.  About $100 a week.  $400 a
8  month.
9      Q.   All right.  Is your business totally
10 electric or do you have a gas bill as well?
11     A.   Total electric.
12     Q.   Okay.  Anything else you can think of
13 that you pay on a monthly basis?
14     A.   No.
15     Q.   Not counting inventory, which we'll get
16 to.  Do you send in a W-9 for your employees?
17     A.   No.  They have to take care of that
18 themselves.
19     Q.   They have to do their own taxes?
20     A.   Uh-huh.
21     Q.   Okay.  So let's talk about BJ.  In a
22 month's time, how much do you think you would pay
23 him?

Page 198

1      A.   Four times.
2      Q.   Four times what?
3      A.   How much -- how many times?  How much
4  amount?
5      Q.   Amount.
6      A.   2,800, 3,000 cash.
7      Q.   And what about Trey?
8      A.   Trey, I'd say about 2,000 to 2,350.
9      Q.   Okay.  And those are the only employees
10 you had --
11     A.   Correct.
12     Q.   -- leading up to this event?  Okay.
13 Now, you said that you had advertising?
14     A.   Yes.
15     Q.   Did you pay that monthly?
16     A.   Monthly.
17     Q.   Okay.  How much was your advertising
18 per month?
19     A.   Several venues.
20     Q.   I saw you had Charter.
21     A.   I have Charter for 1,000.  I have Lamar
22 for about 2,000.  I have radio stations for about
23 1,500.  I have published paper media for about 600

Page 199

1  monthly; flyers, about 200.
2      Q.   Okay.  Does that pretty much cover it?
3      A.   Advertising, yes.
4      Q.   What about any kind of trade magazines?
5  Do you get those or advertise in them?
6      A.   No.
7      Q.   What about legal expenses?  Do you have
8  any attorney's fees that you pay every month?
9      A.   No.
10     Q.   Accounting?  How much do you pay a
11 month to Ms. Harbison?
12     A.   I really don't keep up with it.  She
13 gives me -- you know, she says this is what you
14 owe.  I write a check and I sign it.  I trust the
15 lady.
16     Q.   I mean, as far as her fees, you don't
17 pay her a certain amount, just whatever she --
18     A.   Not a certain amount.  Each job is
19 different.
20     Q.   Okay.  All right.  Let's talk about
21 your supplies and inventory.  How much would you
22 estimate that you spend with Angel each month?
23     A.   You'd have to ask him.

Page 200

1      Q.   And I know it varies.
2      A.   You'd have to ask him.  I really
3  couldn't begin to speculate because I buy so much
4  and I pay a lot of it with cash and he goes back in
5  his system and deletes it.
6      Q.   Okay.
7      A.   So if I say 10,000 and he only shows
8  4,000 on the computer, I come out lying.
9      Q.   Okay.  So I think we have most of those
10 invoices, don't we?  So we could --
11     A.   Maybe most of them.  They got a ton of
12 them on e-mail that they've been sending to me.
13     Q.   Any idea about any of your other
14 suppliers, how much you would pay?
15     A.   No.
16     Q.   Do you have an account at Harbor
17 Freight?
18     A.   Not an account, no.
19     Q.   So you just buy as needed?
20     A.   Yes.
21     Q.   Okay.  So can you tell me how much you
22 would buy at any particular supplier?
23     A.   $20, 300, 500, $800.

Page 201

1    Q.   No, what I'm asking you is:  Can you
2  name me any supplier that you can tell me on the
3  average how much you would spend with that
4  particular one?
5    A.   AVR, minimum of 1,500.  Seytec,
6  minimum, 1,500.
7    Q.   So do you have to maintain a $1,500
8  purchase each month with them?
9    A.   (Witness shakes head.)
10    Q.   No?
11    A.   Just to get free shipping.
12    Q.   Oh, you get free shipping, okay.  All
13  right.  Normally I would have you tell me what your
14  income was every month, but I think we've pretty
15  much established that there's no real way to
16  determine that for sure, is there?
17    A.   Yes, there is.
18    Q.   And that would be?
19    A.   Sales receipt books.
20    Q.   Okay.  Because that's -- those sales
21  receipt books that may or may not be burned that
22  are in the building?
23    A.   No, there's a whole box of them now.

Page 202

1    Q.   I'm talking about the 2014 leading up
2  to --
3    A.   Yeah, I understand that.
4    Q.   -- the event.  Now, as far as the loss
5  of business income, the accountant is interested in
6  looking back so they can project.
7    A.   I understand.
8    Q.   But the purpose of my question right
9  then was, you know, leading up to the fire.  I
10  mean, we have the sales tax returns.  So would it
11  be fair to say that the sales tax returns would be
12  a minimum of your income?
13    A.   Way minimum.
14    Q.   Because we've agreed it's not accurate,
15  right?
16    A.   (Witness nods head.)
17    Q.   Okay.  The Bank of America Visa, is
18  that the only credit card --
19    A.   Correct.
20    Q.   -- that you carry?  And the -- I can't
21  remember the name of that bank.  The P whatever --
22    A.   PNC.
23    Q.   PNC Bank, that's the only account you

Page 203

1  have for 205 Customs?
2    A.   Correct.
3    Q.   And do you run all of your business
4  transactions that you're going to deposit through
5  that account?
6    A.   Correct.
7    Q.   In other words, you don't mingle it
8  with your personal stuff?
9    A.   No.
10    Q.   Okay.  Okay.  Would you give me just a
11  few minutes with Ms. Stubbs and see what I have
12  forgotten that she wants me to cover?
13    MR. LAWRENCE:  Do you want to keep this
14  or do you want me to redo it?
15    MS. WILLIAMSON:  I want you to redo it.
16  That one is marked as an exhibit, so --
17    MR. LAWRENCE:  Do you want to redo it
18  and mark it as an exhibit?
19    MS. WILLIAMSON:  Yeah, if you can.
20    MR. LAWRENCE:  Sure.  That's what I'm
21  asking.
22    MS. WILLIAMSON:  That would be good.
23    MR. LAWRENCE:  And then that way, you

Page 204

1  can just have it for this.
2    (Brief recess.)
3    (Whereupon, Exhibit 15 was marked
4       for identification.)
5    (Whereupon, Exhibit 16 was marked
6       for identification.)
7    Q.   (BY MS. WILLIAMSON:)  Okay.  Mr.
8  Gilpin's car that was back there in the bay, when
9  you were last back there, were any of the doors
10  opened?
11    A.   Yes.
12    Q.   Which door was opened?
13    A.   All four of them.
14    Q.   All four doors were open.  Is that how
15  you left them?
16    A.   Yes.
17    Q.   Did you smell anything unusual when you
18  were around his car?
19    A.   Funk.  I mean, literally electric wires
20  melting, but I couldn't locate any of them.  I
21  looked at all of them, but I didn't see where they
22  -- whoever ran the rig might have hit something
23  that touched something that caused that meltdown.

Page 205

1   But the ones on the top, no, I didn't see anything
2   there.
3        Q.   You didn't smell anything, like an
4   accelerant?
5        A.   I did smell -- no, no accelerant.
6        Q.   Okay.  Talking about your wife's
7   painting, has she ever had a show anywhere where
8   she displayed her paintings?
9        A.   Her paintings are all over Birmingham,
10  Jefferson and Blount County, galleries, Second down
11  here, shows.
12       Q.   Okay.  Tell me some gallery now that is
13  displaying your wife's paintings.
14       A.   I'm the wrong person to ask.
15       Q.   You're the only person I've got to ask.
16  You said that they were all over the place.  So how
17  does she sell her paintings?  Or does she --
18       A.   She doesn't care to sell them.  She
19  displays them.  She does not care to sell any of
20  them.
21       Q.   So to your --
22       A.   She's not a starving artist.
23       Q.   So has she ever like displayed her

Page 206

1   paintings at the Bluff Park Art Show?
2        A.   Yes.
3        Q.   Okay.
4        A.   Somebody who will come in and say okay,
5   for the children of Syria or the children of
6   Africa, we have an art show, can you supply us with
7   30 to 50 of your paintings just to put on display,
8   she will.
9        Q.   Okay.  Does she work solely in the oil
10  medium or does she do other things?
11       A.   Everything.
12       Q.   To your knowledge, right now, are there
13  any of her paintings displayed anywhere in town?
14       A.   Yes.
15       Q.   Where?
16       A.   Don't know where.
17       Q.   But they are somewhere?
18       A.   Yes.
19       Q.   Okay.  Now, the $250,000 price that you
20  put on the painting, is that like a sentimental
21  expression or do you have anything at all that you
22  base that price on?
23       A.   My love for the painting, sentimental,

Page 207

1   the amount of time it took, the material it took.
2   I really wouldn't count that, but yeah, it just
3   meant -- you know, a new store and she said this is
4   going to be your wall and that's where it went.
5        Q.   The pictures that you have on your
6   phone of the interior of your store, does it have
7   that photograph -- does it have that painting?
8        A.   No, but my hard drive does.
9        Q.   Okay.
10       A.   The computer hard drive in the shop
11  because God knows I took about 60 of them.
12       Q.   The electronics that you used,
13  speakers, the gadgets and all that stuff, do those
14  change pretty regularly?  Do they get updated
15  and --
16       A.   Annually.
17       Q.   And the new wiggle and all that stuff?
18  I'm sorry?
19       A.   Annually.
20       Q.   Annually, okay.  So if you buy a
21  stockpile of things, what gives you the confidence
22  that you'll be able to sell them all?
23       A.   I'm a good salesman.

Page 208

1        Q.   I'm sorry?
2        A.   I'm a good salesman.
3        Q.   Okay.  Have you ever had a lawsuit
4   filed against you?
5        A.   There was a guy that filed a lawsuit,
6   yes.
7        Q.   And what was it about?
8        A.   It was about an alarm that
9   malfunctioned.
10       Q.   How was it resolved?
11       A.   Dismissed.
12       Q.   Was it actually tried in court?
13       A.   Yes.
14       Q.   This was small claims court, wasn't it?
15       A.   Yes.
16       Q.   Rancherios or something like that was
17  the guy's name?
18       A.   I think so.
19       Q.   Yeah.  Have any claims been made
20  against you or your business that you've just paid
21  rather than have them result in litigation or a
22  claim?
23       A.   One or two.

**Michael Barakat**                                                         **53**

Page 209

1    Q.    Okay.  And what did they involve?

2    A.    They didn't like the quality of the

3  tint, so I wrote them a check, I apologize.

4    Q.    Like refunded whatever it cost?

5    A.    Yeah.

6    Q.    How much does it cost to get tinted

7  windows?

8    A.    You can pay 500.  You can pay 150.

9    Q.    $150 or $500?

10   A.    Uh-huh.

11   Q.    So what's the difference?

12   A.    Ceramic, metal, non-metal, dye.

13   Q.    Other than those three incidents, any

14  others that you can think of where people were

15  dissatisfied or --

16   A.    No.

17   Q.    -- claimed to sue you or something?

18  Okay.  And I'll ask you one more time.  Did you

19  have anything to do with setting the fire in your

20  business?

21   A.    No.

22   Q.    And you didn't ask anybody to do it for

23  you?

Page 210

1    A.    No.

2    Q.    And other than the guy that you let go

3  that was the manager back in May, have you had any

4  kind of dispute or disagreement with anybody else

5  leading up to the time of the fire?

6    A.    No.

7    Q.    No enemies then that you know of?

8    A.    (Witness shakes head.)

9    Q.    Answer out.

10   A.    No.

11   Q.    Thank you.  Okay.  Let me go over the

12  things we talked about that I asked you if you

13  would follow up on.  I asked you for your September

14  and October bank statements from PNC and the

15  photographs that you have on your phone of Mr.

16  Gilpin's car.

17   A.    Forwarded to you through Kirby.

18   Q.    Yes.  And photos you have of -- the

19  most current photos you have of the inside of the

20  building before the fire.

21   A.    Forwarded to you.

22   Q.    And your 2012 tax returns, but we've

23  decided that came from Mr. Isley, we think?

Page 211

1    A.    Springville Accounting.

2    Q.    Okay.  So we may have to get those with

3  the authorization if there's no harmony there

4  between the two of you still.  Your cancelled

5  checks for 2013, and you said that was at Wells

6  Fargo?

7    A.    Wells Fargo, no record.

8    Q.    Okay.  I think probably the accountant

9  will use that authorization that you gave us and

10  send it to Wells Fargo and see if they can get

11  them.  They probably should keep them longer than

12  that.

13   A.    If the account is closed, he said they

14  don't.  If the account is still current, he said

15  yes.

16   Q.    Really?  What was the name on that

17  account by the way?

18   A.    205 Customs.

19   Q.    Okay.  And if you can locate a

20  photograph or anything of your wife's painting,

21  anything that shows us what it looked like.

22   A.    It's on that hard drive.

23   Q.    Okay.  All right.  And these things

Page 212

1  that I've asked you to follow up on I'll mark as

2  Exhibit Number 17.

3        MR. LAWRENCE:  Are you going to make a

4  copy of that?

5        MS. WILLIAMSON:  Yeah.

6    A.    How do I follow up on them if I already

7  have and couldn't come up with anything?

8    Q.    Well, we talked about that, but the

9  ones on here that you haven't tried or that we

10  talked about today for the first time.  Okay.  Mr.

11  Barakat, I appreciate your time today.  Have you

12  answered all of my questions truthfully?

13   A.    Yes, I have.

14   Q.    Have I been courteous to you?

15   A.    Very.

16   Q.    Thank you.  What will happen at this

17  point is Ms. Loyd will type what we've said into a

18  transcript.  I will send it to Mr. Lawrence for you

19  to read over, make sure that it has been accurately

20  transcribed and I will send you two pieces of

21  paper.  One is a Certificate of Certification that

22  essentially says I've read the transcript, it is

23  accurate except for any changes I make on the

Page 213

1  errata sheet, which is the second piece of paper.
2  And if there is anything to be corrected, put the
3  page number and line where the correction appears
4  and just return those two pieces of paper to me.
5      A.   Okay.
6      Q.   The transcript doesn't have to come
7  back.  The transcript will have all of the exhibits
8  attached.  And if you have any questions between
9  now and then -- it will probably take a couple of
10 weeks for this to happen -- just tell Mr. Lawrence
11 or Mr. Farris and they can get in touch with me.
12 If I don't know the answer, I'll find somebody who
13 does.  Okay?
14     A.   (Witness nods head.)
15          MS. WILLIAMSON:  All right.  Thank you
16 very much.  I appreciate your time.
17          (Whereupon, Exhibit 17 was marked
18           for identification.)
19 (Examination under oath concluded at 2:32 p.m.)
20
21
22
23          END OF EXAMINATION UNDER OATH

Page 214

1          CERTIFICATE
2  STATE OF ALABAMA   )
3  CULLMAN COUNTY     )
4
5      I hereby certify that the above and
6  foregoing examination under oath was taken down by
7  me in stenotype and the questions and answers
8  thereto were transcribed by means of computer-aided
9  transcription, and that the foregoing represents a
10 true and correct transcript of the testimony given
11 by said witness upon said hearing.
12     I further certify that I am neither of
13 counsel, nor of kin to the parties to the action,
14 nor am I in anywise interested in the result of
15 said cause.
16
17
18     /s/ Francee Loyd
19     FRANCEE LOYD, CCR
20     And Commissioner for the
21     State of Alabama at Large
22     CCR 345, Expires 9/30/15
23     MY COMMISSION EXPIRES: 8/7/17